**LEVI & KORSINSKY LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: 415-373-1671

*Attorneys for Lead Plaintiff Arnold Keijzer*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IMMANUEL LAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZOGENIX, INC., STEPHEN J. FARR, and MICHAEL P. SMITH,<br><br>Defendants. | Case No. 19-cv-01975-RS<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>Demand for Jury Trial</u><br><br>Judge: Hon. Richard Seeborg |

Lead Plaintiff Arnold Keijzer ("Keijzer" or "Plaintiff"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation made by and through Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Zogenix, Inc. ("Zogenix") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Zogenix; and (c) review of other publicly available information concerning Zogenix.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CLAIM

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Zogenix between February 6, 2019 through April 8, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiff alleges that defendants Zogenix, Stephen J. Farr, and Michael P. Smith (collectively, "Defendants") violated the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq.* Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2. Zogenix engaged in a reckless gamble that failed to pay off and resulted in millions of dollars of losses to investors. Central to Zogenix's operations as a developmental biopharmaceutical company was its lead drug candidate, ZX008. ZX008's core ingredient was fenfluramine. This was the same ingredient used in the appetite suppressant drugs Pondimin and Fen-Phen. Accordingly, Zogenix's publicly-stated strategy was to file its New Drug Application ("NDA") with the U.S. Food and Drug Administration ("FDA") under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act. Section 505(b)(2) allows applicants to rely on publicly available literature in lieu of recreating costly and time-intensive studies; in this case, Zogenix would support is NDA for ZX008 with public literature concerning fenfluramine's use in Pondimin. In spite of this plan, when push came to shove Zogenix never incorporated the publicly available data for fenfluramine in its NDA, wagering instead that it would not be necessary in light of the NDA's other components. The FDA disagreed strongly and, in response, rejected the NDA out of hand sending reverberations throughout the market as the price of Zogenix's stock plummeted. As alleged herein, Defendants are liable for these losses under the Exchange Act.

3. Federal law requires drug companies to obtain approval from the FDA before marketing their products to consumers. To obtain approval, a company must file an NDA. Most NDAs require extensive pre-clinical and clinical testing to show that the drug is safe and efficacious.

Some NDAs, however, may be abbreviated. Where, as here, a drug is substantially similar or incorporates core components of another drug that has already been approved, an applicant may file its NDA under Section 505(b)(2). This section allows drug companies to avoid conducting certain studies so long as they incorporate or rely upon published literature and the FDA's previous findings of safety and effectiveness for approved products. Given the fact that ZX008's core ingredient was fenfluramine and that the FDA had already approved fenfluramine-related drugs (*e.g.*, Pondimin), Section 505(b)(2) provided a significant advantage to Zogenix.

4. Relying on Section 505(b)(2) was a key part of Zogenix's strategy, as the company and management made clear to investors and analysts on several occasions throughout ZX008's development. Defendant Farr and other senior members of management often emphasized to investors that the FDA had confirmed Zogenix could utilize Section 505(b)(2) for ZX008's NDA. Even in private conversations with analysts, Zogenix highlighted that its key strategy was to file the NDA for ZX008 under Section 505(b)(2) in order to take advantage of the public literature relating to fenfluramine. Analysts were quick to report management's strategy to the public, and give it plenty of praise.

5. When the time finally came to file the NDA, however, Zogenix did not include critical portions of the available public literature relating to fenfluramine. In particular, Zogenix did not include information from the public sphere concerning fenfluramine's toxicity.

6. The FDA responded to Zogenix's NDA for ZX008 by denying it out of hand. In a written correspondence from the FDA to Zogenix, the FDA informed the company that it was refusing to file the NDA because, among other reasons, Zogenix had failed to submit certain nonclinical studies necessary for assessing the toxicity related to the chronic administration of fenfluramine (*i.e.*, ZX008).

7. The FDA's letter, referred to herein as the Refuse-to-File letter or RTF letter, caught analysts and investors by surprise. The literature that was absent from the NDA had been publicly available prior to filing the NDA, was known by Defendants prior to filing the NDA, and was even intended to be included in the FDA, as admitted by Defendant Farr after the Class Period.

Nevertheless, Zogenix decided not to include it in hopes that the company's own clinical data would be sufficient to support the NDA.

8. Defendants subjected investors to a material and undisclosed risk by omitting the public fenfluramine literature from Zogenix's NDA. Regardless of whatever Defendants thought about the company's clinical data (*e.g.*, strong, weak, or otherwise), investors were falsely led to believe that the NDA included this literature and conformed with the company's longstanding strategy associated with filing under Section 505(b)(2). By concealing the fact that the NDA did not include the public fenfluramine literature, Defendants tricked investors into buying stock at artificially inflated prices while depriving them of the ability to properly assess the risks inherent in their investments.

9. In response to news of the FDA's rejection of the NDA, Zogenix's stock plummeted over fears that the commercialization of ZX008 would be delayed substantially. The price Zogenix's stock plummeted to $39.96 per share from $51.85 per share in the span of just one day. Zogenix's overall market capitalization declined by nearly $500 million. Investors lost millions of dollars as a result of Defendants' fraudulent and reckless behavior. Defendants should be held accountable for these losses.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14. Plaintiff Keijzer purchased Zogenix common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud. Plaintiff's certification evidencing his transaction is attached to his motion for appointment as Lead Plaintiff and is incorporated by reference.

15. Defendant Zogenix is a Delaware corporation with its principal executive offices located at 5858 Horton Street, Suite 455, Emeryville, California. During the Class Period, Zogenix securities traded in an efficient market on The Nasdaq Global Market ("NASDAQ") under the symbol "ZGNX."

16. Defendant Stephen J. Farr, Ph.D. ("Farr") has served as Zogenix's Chief Executive Officer ("CEO") at all relevant times. Farr is a co-founder of Zogenix and has served as its President and as a member of its board of directors since August 2006. From 1986 to 1994, Farr was a tenured professor at the Welsh School of Pharmacy, Cardiff University, United Kingdom, concentrating in the areas of physical pharmacy and biopharmaceutics. He is a fellow of the American Association of Pharmaceutical Scientists and visiting Associate Professor in the Department of Pharmaceutics, School of Pharmacy, Virginia Commonwealth University. Farr obtained his Ph.D. degree in Pharmaceutics from the University of Wales.

17. Defendant Michael P. Smith ("Smith") has served as Zogenix's Chief Financial Officer ("CFO"), Executive Vice President, Treasurer and Secretary since January 2017. From January 2015 through December 2016, Smith served as Chief Financial Officer of a global biopharmaceutical company focused on the development and commercialization of transformative therapeutics for rare diseases. In this role, he was responsible for the finance, accounting, corporate development, corporate strategy, intellectual property, and information management business functions. Prior to that role, Smith served in various leadership positions at biopharmaceutical companies, including as Chief Financial and Business Advisor, Vice President of Business Development, and Head of Business Development and Chief Financial Officer. Smith received a

B.S. in Commerce from the University of Virginia and an M.B.A. from the Haas School of Business at the University of California, Berkeley.

18. Defendants Farr and Smith are collectively referred to herein as the "Individual Defendants."

19. Each of the Individual Defendants:

(a) directly participated in the management of Zogenix;

(b) was directly involved in the day-to-day operations of Zogenix at the highest levels;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d) was directly or indirectly involved in the oversight or implementation of Zogenix's internal controls;

(e) was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning Zogenix; and/or

(f) approved or ratified these statements in violation of the federal securities laws.

20. Because of the Individual Defendants' positions within Zogenix, they had access to undisclosed information about the NDA via access to internal corporate documents (including Zogenix's correspondence and communications with the FDA), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

21. As officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information so that the market price of Zogenix's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22. The Individual Defendants, because of their positions with Zogenix, possessed the power and authority to control the contents of Zogenix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Zogenix's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Zogenix common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scienter of the Individual Defendants is imputed to Zogenix under common law principles of agency and/or the doctrine of *respondeat superior*.

## SUBSTANTIVE ALLEGATIONS

24. ZX008 was, and remains, Zogenix's leading drug candidate. ZX008 is intended to treat seizures associated with epilepsy, including Dravet syndrome in particular. The active ingredient in ZX008 is fenfluramine. Fenfluramine was previously used in appetite suppressant drugs such as Pondimin and Fen-Phen.

25. Zogenix began conducting Phase 3 clinical trials for ZX008 (for treatment of Dravet syndrome) in 2016. On July 12, 2018, the company announced positive top-line results from its most recent Phase 3 study. Zogenix reported that the results were consistent with past clinical trials and demonstrated that ZX008 was superior to other Dravet syndrome treatments on the market. Zogenix claimed that the Phase 3 data supported its plans to apply for regulatory approval in the United States and Europe in the fourth quarter of 2018.

26. The news about Zogenix's Phase 3 data and plans for regulatory approval was highly material to investors. Analysts, such as Northland Capital Markets, estimated that ZX008 was capable of generating sales of $2 billion. In response to Zogenix's announcement on July 12, 2018, the price of Zogenix's stock jumped from $46.30 per share on July 11, 2018 to $55.90 per share on July 12, 2018 (and $61.35 per share the following day on July 13, 2018).

27. On August 8, 2018, Zogenix completed a follow-on public offering for the sale of 6,000,000 shares of the company's common stock at a price of $52 per share. Zogenix raised $292.9 million in net proceeds from the offering.

28. On or shortly before November 8, 2018, Zogenix participated in a meeting with the FDA to discuss the filing of the NDA. The purpose of the meeting was for the company and the FDA to agree on topics around the presentation of clinical data, aspects of ZX008's label, commercial manufacturing processes, and product specifications.

29. As of November 8, 2018, Zogenix had already submitted nonclinical portions of the NDA pursuant to a previously agreed-upon rolling submission plan. The company intended on submitting the chemistry and manufacturing/controls sections of the NDA in early December. Zogenix was also conducting some additional data analyses for product labeling purposes. As a result, Zogenix revised its target submission date for the NDA from the fourth quarter of 2018 to the first quarter of 2019.

30. On February 6, 2019, Zogenix announced that it had completed its NDA for ZX008 with the FDA. Zogenix submitted the NDA under Section 505(b)(2) of the FFDCA, as the company previously said it would do on several occasions at or around the time it filed its application to begin clinical testing (circa 2015).

31. Section 505(b)(2) allows drug companies (applicants) to rely upon published literature and the FDA's previous findings of safety and effectiveness for approved products based on prior pre-clinical or clinical trials conducted for the approved product. FDA guidance concerning Section 505(b)(2) applications states, in pertinent part, that:

> An applicant should submit a 505(b)(2) application if approval of an application will rely to any extent on ***published literature*** (a literature-based 505(b)(2)). If the applicant has not obtained a right

> of reference to the raw data underlying the published study or studies, the application is a 505(b)(2) application; if the applicant obtains a right of reference to the raw data, the application may be a full NDA (i.e., one submitted under section 505(b)(1)). An NDA will be a 505(b)(2) application ***if any of the specific information necessary for approval is obtained from literature*** or from another source to which the applicant does not have a right of reference, even if the applicant also conducted clinical studies to support approval. Note, however, that this does not mean any reference to published general information (e.g., about disease etiology, support for particular endpoints, methods of analysis) or to general knowledge causes the application to be a 505(b)(2) application. Rather, reference should be to specific information (clinical trials, animal studies) necessary to the approval of the application.

(emphasis added)

32. Zogenix filed the NDA under Section 505(b)(2) in order to rely on toxicology studies for fenfluramine that were performed previously in connection with the approval of Pondimin.

33. In response to the submission of an NDA, the FDA can either accept it for filing or reject it out of hand. Under 21 CFR 314.50, an NDA is required to include certain standard information in support of the application, such as clinical and nonclinical data. If the required information is provided, then the FDA will accept the application for filing. This means that the applicant has met the threshold requirements for filing an NDA and the FDA can then evaluate the NDA for approval. 21 CFR 314.101

34. However, if the NDA is missing required information, the FDA may refuse to file it and will reject it summarily. 21 CFR 314.101(d). If the FDA refuses to file the NDA, the Agency will notify the applicant in writing and state the reason under paragraph (d) of 21 CFR 314.101 for the refusal. If FDA refuses to file the NDA under paragraph (d) of 21 CFR 314.101, the applicant may request in writing within 30 days of the date of the Agency's notification an informal conference with the Agency about whether the Agency should file the NDA.

35. If, following the informal conference, the applicant requests that FDA file the NDA (with or without amendments to correct the deficiencies), the FDA will file the NDA over protest under paragraph (a)(2) of 21 CFR 314.101, notify the applicant in writing, and review it as filed. If the NDA is filed over protest, the date of filing will be the date 60 days after the date the applicant

requested the informal conference. The applicant need not resubmit a copy of an NDA that is filed over protest.

36. On April 8, 2019, Zogenix announced that the FDA rejected the NDA (filed on or shortly before February 6, 2019). According to the RTF letter received by Zogenix, the FDA had rejected the NDA in part because Zogenix had failed to submit certain nonclinical studies necessary for assessing the toxicity related to the chronic administration of fenfluramine (*i.e.*, ZX008).

37. The particular studies Zogenix omitted were standard 6- and 9-month chronic toxicity studies under the International Conference on Harmonisation (an entity that coordinates pharmaceutical regulations across different countries). Zogenix did not conduct these studies and, although Zogenix filed its NDA under Section 505(b)(2), the company did not incorporate or reference the necessary fenfluramine toxicity literature arising from the Pondimin application.

38. The RTF letter indicated to the market that approval for ZX008 would be substantially delayed. This, in turn, meant that Zogenix would continue sustaining quarter-over-quarter and year-over-year losses and would in all likelihood not become profitable in the near term. Indeed, as of March 31, 2019, Zogenix had an accumulated deficit of over $731 million. Consequently, investors who had purchased Zogenix stock based on the company's supposed progress in terms of ZX008's approval had made a significant mistake by investing because the price of Zogenix's stock at the time of their purchases had been artificially inflated.

39. Analysts reacted sharply to the negative news. Ladenburg Thalmann lowered its price target for Zogenix stock from $71 per share to $50 per share, questioning why the company omitted the toxicology data even though Zogenix was supposedly relying on it, as demonstrated by the fact that the company had filed the NDA under Section 505(b)(2). Guggenheim Securities was equally "puzzl[ed]" in light of Zogenix's "regular dialogue" with the FDA and, in response, downgraded the company to "neutral" and lowered its price target for the company's stock from $70 per share to $40 per share. Northland Securities estimated a conservative 12-month to 15-month delay for approval, noting that Zogenix was had filed the NDA under Section 505(b)(2) and was therefore able to include toxicology literature related to Pondimin.

40. The price of Zogenix's stock dropped significantly in response to the negative news. From a closing price of $51.85 per share on April 8, 2019, Zogenix's stock plummeted to $39.96 per share on April 9, 2019 on extremely heavy trading volume. This decline represented a market capitalization loss of approximately $500 million.

41. On May 8, 2018, Zogenix hosted an investor conference call to discuss the company's financial and operational results for the first quarter of 2019. During the call, Zogenix announced that it had requested a "Type A" meeting with the FDA to discuss the RTF letter and determine whether Zogenix could resubmit the NDA with the toxicology literature from the Pondimin application. A "Type A" meeting is a particular type of meeting that the FDA offers to drug companies for the purpose of helping "an otherwise stalled drug development program to proceed."

42. On June 27, 2019, Zogenix announced that it had conducted the "Type A" meeting with the FDA and that, based on its discussions with the FDA, Zogenix would be resubmitting the NDA. Importantly, the resubmission of the NDA would now include "additional clinical and non-clinical literature" related to the toxicity of fenfluramine that was not included initially.

43. Zogenix provided additional information about its "Type A" meeting and agreement with the FDA to analysts in private. PiperJaffray, for example, told investors on June 27, 2019 that Zogenix management said they would be amending the NDA "to include historical chronic toxicity data" and that they expected to resubmit the NDA in the latter half of the third quarter of 2019.

44. Since June 27, 2019, Zogenix has reported publicly that it intends to resubmit the NDA for ZX008 in September 2019. Provided Zogenix adheres to this timetable, the revised NDA will either be accepted or rejected for filing by the NDA on or before November 29, 2019.

## <u>**FALSE AND MATERIALLY MISLEADING STATEMENTS**</u>

### <u>*February 6, 2019 – Press Release*</u>

45. On February 6, 2019, Zogenix issued a press release concerning the status of the company's NDA. The press release, titled *Zogenix Submits New Drug Application to U.S. Food & Drug Administration and Marketing Authorization Application to European Medicines Agency for FINTEPLA® for the Treatment of Dravet Syndrome*, stated in pertinent part as follows:

> EMERYVILLE, Calif., Feb. 06, 2019 (GLOBE NEWSWIRE) -- Zogenix, Inc. (NASDAQ:ZGNX), a global pharmaceutical company developing rare disease therapies, today announced ***it has completed its rolling submission of a New Drug Application (NDA) to the U.S. Food & Drug Administration (FDA)*** and submitted a Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) for FINTEPLA (ZX008, low-dose fenfluramine) for the treatment of seizures associated with Dravet syndrome. Dravet syndrome is an intractable and difficult-to-treat epilepsy that begins in infancy and is associated with frequent, severe, and potentially life-threatening seizures, developmental delay, and cognitive impairment.
>
> ***Both applications are based on data from two pivotal Phase 3 trials in Dravet syndrome and an interim analysis from an ongoing open-label extension study***, which included 232 patients treated for up to 21 months.

(emphasis added and footnotes omitted)

46. The statements identified above in Paragraph 45 in emphasis were false and materially misleading because they represented that the NDA has been successfully submitted while at the same time concealing that the NDA was facially deficient because of the absence of the necessary toxicity studies and, therefore, presented an exceedingly high likelihood that the FDA would refuse to file the NDA and substantially delay the commercialization of ZX008.

47. Based on prior public statements made by or on behalf of Zogenix, investors believed that Zogenix was filing the NDA under Section 505(b)(2) in order to take advantage of and incorporate the existing toxicology data and literature concerning fenfluramine. For example, in Zogenix's most recent annual report on Form 10-K for the period ending December 31, 2017, Zogenix explained the benefits of Section 505(b)(2) by stating that an "applicant may rely upon published literature and the FDA's previous findings of safety and effectiveness for an approved product based on the prior pre-clinical or clinical trials conducted for the approved product."

48. In fact, ever since Zogenix applied to begin clinical testing in 2015, the company had emphasized that it would be pursuing marketing approval under Section 505(b)(2). For example: (*i*) on July 14, 2015, Zogenix's Executive Vice President and Chief Development officer, Gail Farfel, told investors during an investor conference call that the FDA had "confirmed that a 505(b)(2) path for the NDA submission [was] acceptable . . . ."; (*ii*) on August 10, 2015, Ms. Farfel again

emphasized to investors during an investor conference call that the FDA had "confirmed that a 505(b)(2) NDA submission [was] acceptable . . . ."; and (*iii*) on November 18, 2015, Defendant Farr likewise emphasized that Zogenix had "confirmed the 505(b)(2) NDA pathway in the United States."

49. These statements confirmed to the market that Zogenix would ultimately rely on the historical toxicity literature when it filed the NDA for ZX008. Indeed, management confirmed as much to analysts in private, as demonstrated in the following excerpt from a report written by analysts at Brean Capital, LLC on October 1, 2015:

> Zogenix's ZX008 IND filed on time and we expect a Phase III trial to start during Q4, 2015 as guided. One thing we observed with this management team is that they have always been on time with regards to reaching R&D and regulatory milestones. The on time filing of an IND for ZX008 is incrementally positive for the company, but hardly a surprise to us. On September 28, 2015, the FDA published a new determination that Pondimin (fenfluramine HCl) tablets and Ponderex (fenfluramine HCl) capsules were withdrawn from sale for reasons of safety or effectiveness. The relevancy to ZX008 is that the active ingredient in ZX008 is also fenfluramine. The question is if this new FDA decision will impact the ZX008 regulatory filing strategy. ***We communicated with management and they confirmed that the FDA decision would not impact the company's regulatory plans, which is consistent with our own understanding of the 505b(2) pathway where the application is allowed to reference information (mainly non clinical data) from the literature, not necessarily from an existing NDA***. With the company conducting two pivotal randomized controlled trials to establish fenfluramine safety and efficacy in Dravet syndrome and fenfluramine used for Dravet syndrome is at 5-30% dose of that used in weight-loss, we believe most of the safety and efficacy data for Dravet syndrome are likely to be generated from the upcoming Phase III studies, while most of the data reference is likely to be limited to pre-clinical data.

(emphasis added)

50. Nevertheless, when Zogenix completed its NDA submission, it did not include or rely upon the published fenfluramine toxicity literature. The citation to this information was conspicuously absent from the NDA because, as later explained by Defendant Farr, the company opted to instead bet that its clinical trial data was strong enough to obviate the need for including the toxicity literature. Regardless of the strength of the clinical data or what Defendants believed, by choosing to omit the toxicity literature from the NDA Defendants exposed Zogenix's investors to an

unexpected and severe risk that the NDA would be rejected. By concealing this risk from investors, investors were unfairly deprived of the ability to properly evaluate the risks associated with their purchases of Zogenix stock.

51. Analysts, like investors, were also misled. Ladenburg Thalmann, for example, questioned why the toxicity literature was missing and noted that "fenfluramine was approved in 1973 for weight loss, so the [ZX008] NDA was filed under the 505(b)(2) regulatory pathway, allowing the applicant to rely upon the non-clinical evidence from the original NDA approval." Northland Capital Markets likewise expressed confusion, explaining that the FDA had told Zogenix not to "provide non-clinical toxicology, as the NDA for [ZX008] was being filed using the 505(b)(2) pathway that would allow inclusion of toxicology data from NDA of fenfluramine, i.e., Pondimin® filed in 1972."

52. Zogenix's February 6, 2019 press release discussed the status of the company's NDA and, for that reason, was material to investors. Retail and institutional investors alike purchased Zogenix stock in reliance on the false and materially misleading statements and omissions. In response to the press release, Zogenix's stock increased from $45.66 per share on February 5, 2019 to $47.68 per share on February 6, 2019.

***<u>February 28, 2019 – Annual Report and Conference Call</u>***

53. On February 28, 2019, Zogenix filed its annual report on Form 10-K with the SEC for the year ended December 31, 2018. Defendants Farr and Smith signed the annual report.

54. Zogneix's annual report for the year ended December 31, 2018 discussed the company's NDA at length. In pertinent part, the annual report stated that:

> "In February 2019, ***we completed our rolling submission of a NDA with the FDA*** and submitted a MAA to the EMA for Fintepla for the treatment of seizures associated with Dravet syndrome. Both applications were based on data from Study 1 and Study 1504 in Dravet syndrome and the interim analysis from Study 1503. The EMA has accepted the MAA and initiated its review."

> "In some cases, ***the FDA may condition the approval of the NDA on the sponsor's agreement to conduct additional pre-clinical and clinical studies to further assess the drug's safety and effectiveness***

> ***after NDA approval***. Such post-approval studies are typically referred to as Post-Marketing or Phase 4 studies."
>
> "We are developing proprietary product candidates, including Fintepla, for which we may seek FDA approval through the Section 505(b)(2) regulatory pathway. . . . Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from trials that were not conducted by or for the applicant and for which the applicant has not obtained a right of reference. ***Section 505(b)(2), if applicable to us under the FDCA, would allow an NDA we submit to the FDA to rely in part on data in the public domain or the FDA's prior conclusions regarding the safety and effectiveness of approved compounds, which could expedite the development program for our product candidates by potentially decreasing the amount of clinical data that we would need to generate in order to obtain FDA approval. If the FDA does not allow us to pursue the Section 505(b)(2) regulatory pathway as we anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval***."

(emphasis added)

55. The statements identified in Paragraph 54 above in emphasis were false and materially misleading because they omitted and concealed the exceedingly high risk that the FDA would refuse to file the NDA due to the absence of necessary toxicology studies.

56. Zogenix had been representing to the market for years that it would be filing the NDA for ZX008 under Section 505(b)(2) in order to take advantage of the existing fenfluramine toxicity literature (as detailed above in Paragraphs 47-49). The statements identified above perpetuated that representation by either explicitly recognizing the benefits of filing under Section 505(b)(2) or concealing that the NDA did not include the toxicity literature that was supposed to be referenced under Section 505(b)(2). Consequently, investors were unable to properly evaluate the risks associated with the NDA and, in turn, their investments in Zogenix.

57. Zogenix also held an investor conference call on February 28, 2019. The purpose of the call was to discuss the company's financial and operational performance for the year ended December 31, 2018. During the opening remarks portion of the call, Defendant Farr provided a misleading description of the company's progress towards obtaining approval for ZX008. In pertinent part, Farr stated as follows:

> We have continued our strong momentum at the start of 2019, highlighted by the ***completion of the rolling submission of an NDA to the U.S. Food and Drug Administration*** and the submission of an MAA to the European Medicines Agency for FINTEPLA for the treatment of seizures associated with Dravet syndrome. I'm pleased to report that the EMA has now accepted our MAA for review, and we anticipate that an approvability decision could be reached by the EMA in the first quarter of 2020.
>
> We expect to hear from the FDA in regards to the final status of our NDA submission in the next several weeks. If the FDA grants priority review for FINTEPLA NDA, we would anticipate a PDUFA target date in the third quarter of this year.
>
> These regulatory submissions represent a considerable achievement for Zogenix, and I'd like to take a moment to extend my sincere thanks to the patients and families, investigators and their staff and other experts who participated in the ZX008 clinical trial program over the last 4 years.
>
> I'd also like to recognize all of my colleagues at Zogenix, who have worked so diligently to make these submissions a reality.
>
> With the data obtained in our clinical Phase III program, we firmly believe FINTEPLA has the potential to be a compelling treatment option for Dravet syndrome.
>
> ***The regulatory applications in United States and Europe are based on data from the 2 pivotal Phase III trials in Dravet syndrome that I mentioned earlier, and an interim analysis from an ongoing open-label extension study, Study 1503, which included 232 patients treated for up to 2 years***. Both of the pivotal trials met their primary endpoints and all key secondary measures with high statistical significance.
>
> . . .
>
> I would like to conclude my remarks by highlighting Zogenix' objectives for 2019. ***We've already accomplished one key objective for the year with the completion of our NDA and MAA submissions***, and excited to have received confirmation today that our MAA has been accepted for review. We're now looking forward to learning of the acceptance for filing of the NDA and receiving a PDUFA target date from the FDA.

(emphasis added)

58. Similar to the representations in the February 6, 2019 press release and February 28, 2019 annual report, Farr's statements during the conference call identified in Paragraph 57 above in

emphasis were false and materially misleading because they omitted and concealed the substantial risk the FDA would reject the NDA that Zogenix created by not including the fenfluramine toxicology literature in the NDA, as Zogenix was allowed to do under Section 505(b)(2) and had in fact said it would do on numerous occasions previously. By creating and then concealing this risk, Defendants subjected investors to undisclosed, material and negative circumstances that would have altered their decisions to purchase Zogenix stock.

59. Zogenix's annual report and Defendant Farr discussed the status of the company's NDA at length on February 28, 2019 and, for that reason among others, these statements were material to investors. Retail and institutional investors alike purchased Zogenix stock in reliance on this news. In response to the disclosures, Zogenix's stock increased from $52.73 per share on February 28, 2019 to $53.95 per share on March 1, 2019.

**ADDITIONAL SCIENTER ALLEGATIONS**

60. Defendants acted with fraudulent intent and/or deliberate recklessness when making the above misrepresentations and material omissions.

61. Prior to the Class Period, Defendants made a series of public statements to investors confirming that the NDA for ZX008 would be filed pursuant to Section 505(b)(2) for the purpose of referencing and/or incorporating historical fenfluramine toxicity studies (and avoiding the need to conduct new toxicity studies). For example:

(a) On July 14, 2015, Zogenix's Executive Vice President and Chief Development officer, Gail Farfel, told investors during an investor conference call that the FDA had "confirmed that a 505(b)(2) path for the NDA submission [was] acceptable . . . .";

(b) On August 10, 2015, Ms. Farfel again emphasized to investors during an investor conference call that the FDA had "confirmed that a 505(b)(2) NDA submission [was] acceptable . . . ."; and

(c) On November 18, 2015, Defendant Farr likewise emphasized during an investor presentation that Zogenix had "confirmed the 505(b)(2) NDA pathway in the United States."

62. Zogenix management also told analysts that it would be filing the NDA under Section 505(b)(2) in order to rely on the historical toxicity literature. As described by Brean Capital, LLC on October 1, 2015, analysts had "communicated with [Zogenix] management and they confirmed that the FDA decision [regarding revoking the marketing license for Pondimin] would not impact the company's regulatory plans, which is consistent with our own understanding of the 505b(2) pathway where the application is allowed to reference information (mainly non clinical data) from the literature, not necessarily from an existing NDA."

63. Zogenix's annual report on Form 10-K for the period ending December 31, 2017 (filed March 6, 2018), the most recent annual report prior to the start of the Class Period, also emphasized the fact that the NDA for ZX008 would be filed under Section 505(b)(2). In the report, which was signed by Defendants Farr and Smith, Zogenix explained the benefits Section 505(b)(2) by stating that an "applicant may rely upon published literature and the FDA's previous findings of safety and effectiveness for an approved product based on the prior pre-clinical or clinical trials conducted for the approved product."

64. Notwithstanding the fact that Zogenix was filing the NDA under Section 505(b)(2) in order to include the existing fenfluramine toxicity literature, Zogenix intentionally omitted it from the NDA for ZX008.

65. Defendants' statements after the Class Period confirm that they knew the data was available prior to filing the NDA yet decided not to include it in support of the NDA. For example, on April 8, 2019, Defendant Farr admitted during an investor conference call in response to an analyst question that he was aware of the toxicology literature prior to submitting the NDA and that it should have been included in the NDA:

> <Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: Steve, I just wanted to clarify. So to be clear, do you have the nonclinical toxicology data that FDA is asking for or would you have to generate this data from scratch?
>
> <Stephen J. Farr>: ***We know that there are literature data on chronic toxicology with fenfluramine based upon the prior NDA for [Pondimin]***. We have not started any chronic toxicology studies. We have conducted what we believe, based upon our FDA

> correspondence, was the appropriate nonclinical package for the NDA and that was (inaudible) with the FDA.
>
> <Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst> Okay. So did your -- ***so is it your expectation that there are sufficient historical nonclinical toxicology data that are available and kind of in the mode that FDA might want them to comply with ICH guidelines***? Or do you expect that you will need to generate additional data?
>
> <Stephen J. Farr>: ***That is our view right now***, but obviously we need to have that Type A meeting with the FDA before we can confirm that.
>
> <Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: ***But it's your view that you can leverage the old data or generate new data***?
>
> <Stephen J. Farr>: No, ***we can leverage the old data*** but we will need to confirm that obviously with the Type A meeting, that would be one of the major discussion points for that meeting.
>
> <Paul Andrew Matteis - Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst>: Okay. And then do you know, Steve, that if historically because fenfluramine was an obesity drug in adults, if chronic tox work was done in juvenile models or if that's at all relevant here?
>
> <Stephen J. Farr>: We conducted the appropriate juvenile toxicologies for our NDA.

(emphasis added)

66. Defendant Farr also admitted that the toxicology literature was available publicly prior to the filing of the NDA. During an investor conference call on May 8, 2019, Farr stated as follows in response to an analyst question:

> <Difei Yang Mizuho Securities USA LLC, Research Division>: So very quickly, with regards to this preclinical toxicology study or the data, is it available in the public domain? Or does it require you to negotiate with a third party to access that data?
>
> <Stephen J. Farr>: ***The data are published in the peer review that it should affect. Obviously, the full study reports are not in the literature. But the findings from all the chronic toxicity studies are in the literature***.

> <Difei Yang Mizuho Securities USA LLC, Research Division>: Okay. So does that mean you can just reference to the literature and that will be good enough? Or you think the FDA, historically, they wanted the data to be in certain ways?
>
> <Stephen J. Farr>: We would obviously prefer to reference the literature data and to show the totality of evidence with respect to the safety of fenfluramine that we have also established in our Phase III program. And as you might imagine, that will be a key area of discussion at the Type A meeting. So we will know more after the meeting.

(emphasis added)

67. Defendant Farr also admitted that Zogenix had intended to reference the fenfluramine literature, but ultimately omitted it when the company filed the NDA. During an interview with Tazeen Ahmad from BofA Merrill Lynch, Farr stated in pertinent part as follows:

> <Tazeen Ahmad BofA Merrill Lynch, Research Division>: . . . And maybe you can just talk to us about the discussions that had taken place with the agency when you decided to look at this particular indication for this particular molecule. And when those discussions happened? And I guess, where you think the disconnect actually happened.
>
> <Stephen J. Farr>: Well, we started down this path in -- around 2015 where we inherited regulatory minutes from a previous owner of the asset. We actually acquired the company. It's a company was called Brabant Pharma. And we obviously, as part of our diligence, ***we were keenly aware of the past history of fenfluramine*** and wanted to balance that with the remarkable data that we generated in Belgium with respect to its use in Dravet syndrome in reducing seizures and making many patients actually seizure-free.
>
> . . .
>
> We did conduct the nonclinical trials or the studies that we felt we had agreement with the FDA on. ***We were going to reference the chronic toxicity from the old Pondimin days, reference it through literature,*** and then to supplement that with nonclinical trials -- or nonclinical studies, I should say, with genotoxicology and importantly, juvenile toxicology, which allowed us to really bridge from the non-chronic tox to allow us to start to dose children, and then ultimately to move forward with reproductive toxicology and cancerogenicity testing as a post-market required studies. . . . .

(emphasis added)

68. Farr and other members of Zogenix management believed that the company's clinical data was exceedingly strong. Indeed, as explained by Farr during the interview with Mr. Ahmad from BofA Merrill Lynch, Zogenix gambled that the strength of the clinical data would obviate the need for the toxicology data that the company ultimately did not include with the NDA. Farr stated, in pertinent part, as follows:

> So we embarked upon conducting a Phase III program with very intense regulatory feedback at the time with respect to what would be required to prospectively evaluate for a potential cardiovascular signal in our Phase III program. So here we are 3-plus years later I think with really stellar data, both from an efficacy and safety perspective where we have not been -- where we have not demonstrated in any child in our program. We have over 300 children in open-label extension right now. We're continuing to monitor for echos -- for valvulopathy through echocardiography and have seen no evidence of valvulopathy or importantly for pulmonary arterial hypertension.
>
> So we feel that with respect to a cardiovascular safety signal, which led to its withdrawal from the market, we adequately addressed that in our Phase III program. It's our belief that really conducting chronic toxicity studies are not going to add to our knowledge of that because it really was not been -- was not demonstrated with any robustness in any animal model, and we've obviously studied it in humans where the safety signal had occurred. So that's where we stand.

69. By engaging in this gamble, Defendants acted with scienter when discussing the NDA and benefits of filing under Section 505(b)(2) on February 6 and 28, 2019 (as discussed above). Defendants intentionally, or with deliberate recklessness, subjected investors to an undisclosed and material risk without their knowledge or permission.

## LOSS CAUSATION AND ECONOMIC LOSS

70. Defendants' materially misleading statements and omissions during the Class Period resulted in Plaintiff and other Class members purchasing Zogenix's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other Class members.

71. As alleged herein:

(a) the market for Zogenix's stock was open, well-developed and efficient at all relevant times;

(b) Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of Zogenix and its prospects, thus causing Zogenix's shares to be overvalued and the market price of the Zogenix's shares to be artificially inflated during the Class Period;

(c) Defendants created an unrealistically positive assessment of Zogenix and its prospects by, in part, concealing risks associated with exposure arising from Zogenix's deficient NDA;

(d) Plaintiff and other Class members purchased or otherwise acquired Zogenix stock relying upon the integrity of the market price for Zogenix shares and market information relating to Zogenix;

(e) The risks associated with exposure arising from Zogenix's deficient NDA materialized and, in turn, investors discovered that Defendants' public statements were materially misleading; and

(f) Upon discovery of Defendants' materially misleading statements and/or material omissions, Zogenix's share price suffered severe devaluation.

72. Specifically, Defendants' misrepresented material information about the NDA for ZX008 by omitting and/or concealing the fact that the NDA did not contain references to or otherwise incorporate necessary literature concerning the toxicity of fenfluramine. The truth concerning these misrepresentations and omissions emerged when Zogenix announced on April 8, 2019 that it had received the RTF letter citing the absence of the literature as the basis for rejecting the NDA. This disclosure resulted in a direct and significant decline in the price of Zogenix's stock, *i.e.*, Zogenix's stock plummeted to $39.96 per share from $51.85 per share in the span of just one day.

73. The price of Zogenix's stock was artificially inflated during the Class Period as a result of the market being unaware that the NDA was facially deficient. Once the public discovered

the truth about the NDA, the artificial inflation in the price of Zogenix's stock dissipated. Public investors suffered economic damages as a result thereof.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

74. At all relevant times, the market for Zogenix's common stock was an efficient market for the following reasons, among others:

(a) Zogenix common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Zogenix common stock was actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Zogenix filed with the SEC periodic public reports during the Class Period;

(d) Zogenix regularly communicated with public investors via established market communication mechanisms;

(e) Zogenix was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Zogenix was rapidly reflected in and incorporated into Zogenix's stock price during the Class Period.

75. As a result of the foregoing, the market for Zogenix's common stock promptly digested current information regarding Zogenix from all publicly available sources and reflected such information in Zogenix's stock price. Under these circumstances, all purchasers of Zogenix common stock during the Class Period suffered similar injury through their purchase of Zogenix common stock at artificially inflated prices, and a presumption of reliance applies.

76. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have been able to properly evaluate the risks associated with Zogenix and the NDA for ZX008 when deciding whether to purchase and/or sell stock in Zogenix.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

77. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As explained above, Defendants concealed a then-present and existing risk with respect to the adequacy of the NDA for ZX008.

78. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

79. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Zogenix who knew that the "forward-looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

**CLASS ACTION ALLEGATIONS**

80. Plaintiff brings this action on behalf of all individuals and entities who purchased acquired Zogenix common stock on the public market during the Class Period, and were damaged, excluding Zogenix, the Individual Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

81. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Zogenix's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Zogenix at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Zogenix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 15, 2019, Zogenix had 42,218,424 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

82. Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

83. Plaintiff has and will continue to fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b) whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements concerning the NDA for ZX008;

(c) whether the price of Zogenix common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d) whether the Class members have sustained damages and, if so, what is the proper measure of damages.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

***Violation of Section 10(b) and Rule 10b-5 Against All Defendants***

86. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other Class members to purchase Zogenix common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

88. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Zogenix's common stock in an effort to maintain artificially high market prices for Zogenix's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the NDA for ZX008 as specified herein.

90. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Zogenix's value and performance which included the making of, or participation in the making of, untrue statements of material facts

and omitting to state material facts necessary in order to make the statements made about the NDA for ZX008 in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Zogenix's common stock during the Class Period.

91. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at Zogenix during the Class Period and members of Zogenix's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of Zogenix, was privy to and participated in the creation, development and reporting of Zogenix's SEC filings and public statements concerning the NDA for ZX008; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of Zogenix's management team, internal reports and other data and information about the NDA for ZX008, at all relevant times; and (4) each Individual Defendant was aware of Zogenix's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing a risk concerning the NDA for ZX008 from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misrepresentations concerning the NDA for ZX008 throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Zogenix's common stock

was artificially inflated during the Class Period. In ignorance of the fact that market prices of Zogenix's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other Class members acquired Zogenix's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

94. At the time of said misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other Class members and the marketplace known the truth regarding the NDA for ZX008, which was not disclosed by Defendants, Plaintiff and other Class members would not have purchased or otherwise acquired their Zogenix common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

95. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

96. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Zogenix's common stock during the Class Period.

97. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

**COUNT II**

***The Individual Defendants Violated Section 20(a) of the Exchange Act***

98. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99. The Individual Defendants acted as controlling persons of Zogenix within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of

Zogenix's operations and/or intimate knowledge of the false information filed by Zogenix with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Zogenix, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Zogenix's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

100. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Zogenix and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101. As set forth above, Zogenix and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

102. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of Zogenix's common stock during the Class Period.

103. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated: September 10, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: 415-373-1671

-and-

Nicholas I. Porritt
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
(*pro hac vice to be submitted*)

*Attorneys for Lead Plaintiff Arnold Keijzer and Lead Counsel for the Class*