**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294

*Attorneys for Lead Plaintiff Arnold Keijzer*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMMANUEL LAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZOGENIX, INC., STEPHEN J. FARR, and MICHAEL P. SMITH,<br><br>Defendants. | Case No. 19-cv-01975-RS<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hearing Date: January 23, 2019<br>Time: 1:30pm<br>Courtroom 3, 17th Floor<br><br>Hon. Richard Seeborg |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................................... 4

        A.     Defendants Promoted Zogenix and FINTEPLA based on Section 505(b)(2)
               Eligibility. ................................................................................................... 4

        B.     In an About-Face, Defendants Excluded the Fenfluramine Literature from the
               FINTEPLA NDA Despite the Extreme Risk of Rejection and Without Any
               Warning to Investors. ................................................................................... 5

        C.     The FDA "Refused to File" the FINTEPLA NDA and Zogenix's Stock Price
               Plummeted as the Market Reassessed Risk. ................................................ 7

III.    ARGUMENT ......................................................................................................... 9

        A.     Defendants Violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. ..... 9

               1.     Legal Standard. ................................................................................ 9

               2.     The Complaint Adequately Pleads Materially Misleading Omissions. ....... 9

                      a)     Plaintiff adequately alleges the omitted facts. ............................ 13

                      b)     Defendants' risk warnings were insufficient and misleading. ....... 15

                      c)     Plaintiff does not allege "fraud-by-hindsight." ........................... 17

               3.     The Complaint Adequately Pleads Defendants' Scienter .......................... 18

                      a)     Defendants engaged in a deliberate and reckless gamble. .............. 19

                      b)     Blaming the FDA is not a viable defense. ................................... 21

                      c)     Plaintiff's theory of scienter is far more compelling than
                             Defendants' attempt to scapegoat the FDA. ................................ 24

        B.     Farr and Smith Violated Section 20(a) of the Exchange Act. ............................... 24

IV.     CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*In re Allied Nev. Gold Corp. Sec. Litig.*,

743 F. App'x 887 (9th Cir. 2018) ........................................................................................ 19

*In re Amylin Pharms., Inc. Sec. Litig.*,

No. 01cv1455 BTM(NLS), 2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003) ............... 4, 21

*In re Arrowhead Pharmaceuticals, Inc. Securities Litigation*,

No. CV 16-08505, 2017 U.S. Dist. LEXIS 222580 (C.D. Cal. Dec. 21, 2017) ......................... 23

*Asher v. Baxter Int'l Inc.*,

377 F.3d 727 (7th Cir. 2004) ............................................................................................ 16

*In re Atossa Genetics Inc. Sec. Litig.*,

868 F.3d 784 (9th Cir. 2017) .............................................................................................. 3

*Berson v. Applied Signal Tech., Inc.*,

527 F.3d 982 (9th Cir. 2008) ........................................................................................ 10, 16

*Brody v. Transitional Hospitals Corp.*,

280 F.3d 997 (9th Cir. 2002) ............................................................................................ 10

*City of Edinburgh Council v. Pfizer, Inc.*,

754 F.3d 159 (3d Cir. 2014) ............................................................................................. 23

*Cozzarelli v. Inspire Pharmaceuticals, Inc.*,

549 F.3d 618 (4th Cir. 2008) ........................................................................................ 22, 23

*Dougherty v. Esperion Therapeutics, Inc.*,

905 F.3d 971 (6th Cir. 2018) ............................................................................................ 22

*Eminence Capital, LLC v. Aspeon, Inc.*,

316 F.3d 1048 (9th Cir. 2003) ........................................................................................... 25

*Fabbri v. Wilkinson*,

No. CV 19-1643 FMO (AGRx), 2019 U.S. Dist. LEXIS 192859 (C.D. Cal. Nov. 5, 2019) ......... 9

*Flynn v. Sientra, Inc.*,

No. CV 15-07548 SJO (RAOx), 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) ......... 16

*Frater v. Hemispherx Biopharma, Inc.*,

    996 F. Supp. 2d 335 (E.D. Pa. 2014) ................................................................... 20

*FTC v. AbbVie Inc.*,

    329 F. Supp. 3d 98 (E.D. Pa. 2018) ..................................................................... 22

*In re Harman Int'l Indus., Inc. Sec. Litig.*,

    791 F.3d 90 (D.C. Cir. 2015) ............................................................................... 16

*Howard v. Everex Sys.*,

    228 F.3d 1057 (9th Cir. 2000) ............................................................................. 24

*In re Intrexon Corp. Securities Litigation*,

    No. 16-cv-02398-RS, 2017 U.S. Dist. LEXIS 26401 (N.D. Cal. Feb. 24, 2017) ........................ 17

*Kader v. Sarepta Therapeutics, Inc.*,

    No. 1:14-cv-14318-ADB, 2016 U.S. Dist. LEXIS 46025 (D. Mass. Apr. 5, 2016) ..................... 14

*Khoja v. Orexigen Therapeutics, Inc.*,

    899 F.3d 988 (9th Cir. 2018) ................................................................... 9, 11, 13, 15

*Khoja v. Orexigen Therapeutics, Inc.*,

    No. 15-CV-540 JLS (JLB), 2019 U.S. Dist. LEXIS 162366 (N.D. Cal. Sept. 23, 2019) ............ 23

*Lloyd v. CVB Financial Corp.*,

    811 F.3d 1200 (9th Cir. 2016) .......................................................................... 3, 11

*Maiman v. Talbott*,

    No. SACV090012AGANX, 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) .............................. 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,

    513 F.3d 702 (7th Cir. 2008) ............................................................................ 4, 23

*In re MannKind Sec. Actions*,

    835 F. Supp. 2d 797 (C.D. Cal. 2011) ............................................................... passim

*Matrixx Initiatives Inc. v. Siracusano,*

    563 U.S. 27 (2011) ...................................................................................... passim

*In re McKesson HBOC, Inc. Sec. Litig.*,

    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................. 14

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 19-cv-01975-RS

*In re MF Glob. Holdings Sec. Litig.*,

   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........................................................................................ 20

*Miller v. Thane Int'l, Inc.*,

   519 F.3d 879 (9th Cir. 2008) ..................................................................................................... 11

*No. 84 Empl.-Teamster Jt. Council Pension Tr. Fd. V. Am. W. Holding Corp.*,

   320 F. 3d 920 (9th Cir. 2003) .................................................................................................... 24

*In re Nuvelo, Inc.*,

   668 F. Supp. 2d 1217 (N.D. Cal. 2009) ..................................................................... 12, 17, 20, 22

*In re PTC Therapeutics, Inc., Sec. Litig.*,

   No. 16-1124 (KM) (MAH), 2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017) ................. 14

*In re Quality Systems*,

   865 F.3d 1130 (9th Cir. 2017) ................................................................................................... 15

*In re Regulus Therapeutics Inc. Sec. Litig.*,

   No. 3:17-cv-0182-BTM-RBB, 2019 U.S. Dist. LEXIS 152443 (S.D. Cal. Sep. 5, 2019) ........... 14

*Ronconi v. Larkin*,

   253 F.3d 423 (9th Cir. 2001) ..................................................................................................... 19

*In re Sanofi Securities Litigation*,

   87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......................................................................................... 23

*Scandlon v. Blue Coat Sys.*,

   No. C 11-4293 RS, 2013 U.S. Dist. LEXIS 10433 (N.D. Cal. Jan. 25, 2013) ............................ 18

*Schueneman v. Arena Pharms., Inc.*,

   840 F.3d 698 (9th Cir. 2016) ................................................................................... 16, 20, 22, 23

*Shanawaz v. Intellipharmaceutics. Int'l Inc.*,

   348 F. Supp. 3d 313 (S.D.N.Y. 2018) ........................................................................................ 18

*Takeda Pharms., U.S.A., Inc. v. Burwell*,

   78 F. Supp. 3d 65 (D.D.C. 2015) ......................................................................................... 19, 22

*Thomas v. Magnachip Semiconductor Corp.*,

   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................................... 24

iv

*Tongue v. Sanofi*,

   816 F.3d 199 (2d Cir. 2016) .......................................................................................... 18

*Vallabhaneni v. Endocyte, Inc.*,

   No. 1:14-cv-01048-TWP-MJD, 2016 U.S. Dist. LEXIS 673 (S.D. Ind. Jan. 4, 2016) ................ 18

*In re Viropharma, Inc., Sec. Litig.*,

   No. 02-1627, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003)....................................... 13, 22

*Zaghian v. Farrell*,

   675 F. App'x 718 (9th Cir. 2017)................................................................................. 16

**Statutes**

15 U.S.C. §78u-4 .............................................................................................................. 9, 19

21 U.S.C. §355.................................................................................................................. 19

**Other Authorities**

17 C.F.R. §240.10b-5.......................................................................................................... 11

21 C.F.R. §314.101 ............................................................................................................ 6

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 19-cv-01975-RS

## I.    INTRODUCTION

Defendants committed securities fraud under the Securities Exchange Act of 1934. In public statements to the market, Defendants concealed a known, material and adverse fact that would have indicated to analysts and investors that buying stock in Zogenix was exponentially riskier than they were led to believe. This known, material and adverse fact was that Zogenix intentionally omitted a crucial piece of information from the company's New Drug Application ("NDA") that it filed with the U.S. Food and Drug Administration ("FDA"). Had Defendants disclosed this information—which would have been elementary to do—investors would have been able to properly gauge the risks associated with buying stock in Zogenix and either decided not to do so or, if they did, bought at substantially lower prices. Instead, these investors were kept in the dark and left with staggering losses once the risks created and concealed by Defendants came to fruition.

Zogenix is a nascent biopharmaceutical company. Its lead drug candidate is FINTEPLA, which is intended to treat seizures through low doses of fenfluramine. Fenfluramine was the active ingredient used in the appetite-suppressant drugs Fen-Phen and Pondimin. Although the FDA banned these drugs in the late-1990s after evidence of heart valve damage emerged, Zogenix was able to claim a unique business advantage based on fenfluramine's prior approval and use. When a drug is substantially similar to, or incorporates core components of, a drug that has already been approved, an applicant may file its NDA under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act. Significantly, Section 505(b)(2) allows drug companies to avoid conducting costly, time-consuming, and potentially risky studies if they incorporate or rely upon published literature or studies conducted by the previous manufacturer.

Zogenix and its Chief Executive Officer, Defendant Stephen J. Farr, ginned up amazing interest among investors based on the company's ability to use Section 505(b)(2) when filing its NDA for FINTEPLA. Repeatedly, in public SEC filings and private conversations with analysts (*e.g.*, Brean Capital, LLC), Farr and other executives emphasized that the FDA had "confirmed that a 505(b)(2) path for the NDA submission [was] acceptable," that Zogenix had "confirmed the 505(b)(2) NDA pathway in the United States" with the FDA, and that Zogenix would be relying on existing public literature when filing its NDA pursuant to Section 505(b)(2). This allowed Zogenix

to avoid conducting a series of toxicity studies relating to the chronic administration of fenfluramine (*i.e.*, the active ingredient in FINTEPLA). Analysts recognized Zogenix's Section 505(b)(2) strategy as a boon to the company's prospects for FINTEPLA and, in turn, revenue (which analysts estimated to be as much as $2 billion). With Section 505(b)(2) in their arsenal, Defendants were able to raise nearly $300 million in an equity offering on August 8, 2018.

On February 6, 2019, the first day of the Class Period, Zogenix announced that it had "completed" its NDA for FINTEPLA with the FDA. Contrary to the company's past representations in SEC filings and conversations with analysts, ***and absent from their announcements on February 6, 2019 or afterwards***, Zogenix had decided to exclude the fenfluramine literature references from its NDA for FINTEPLA. Zogenix's decision to exclude the references created a substantial, extraordinary risk that the FDA would reject the NDA out of hand for failing to meet Section 505(b)(2)'s threshold requirements. Indeed, as FDA guidance explains, an applicant must reference "public literature" when submitting an NDA pursuant to Section 505(b)(2). Sure enough, the risk concealed by Defendants came to pass when, on April 8, 2019, Zogenix announced that it had received a "Refuse-to-File" letter (the "RTF letter") from the FDA rejecting its NDA for FINTEPLA.

Analysts were stunned by the news. In response to questioning, Farr initially blamed the FDA. He claimed that the FDA rejected the NDA for failing to include non-clinical studies that the FDA had never asked for in previous meetings. However, in subsequent communications with analysts, the truth came to light and ***Farr revealed that the NDA did not include the fenfluramine public literature that Zogenix said it would include***. In fact, as Farr later admitted, Zogenix was "keenly aware of the past history of fenfluramine" and was "going to reference the chronic toxicity . . . literature," but decided against doing so on the belief that the company's clinical data "adequately addressed" the need for including it. Analysts were "puzzl[ed]" by Zogenix's decision to exclude this information from the NDA. They questioned why Zogenix had decided to omit arguably the most crucial component of the NDA in light of Section 505(b)(2)'s requirements and the FDA's explicit verbal and written instructions. Zogenix's stock price plummeted in response to the revelations as the market struggled to reassess the company's risk profile and prospects for

success. Approximately $500 million in market capitalization disappeared in the span of just one day. Plaintiff, on behalf of himself and other similarly situated Zogenix investors, is attempting to recover the losses investors suffered as a result.

Defendants have moved to dismiss under Rule 12(b)(6). Their primary argument is that Plaintiff cannot adequately allege the element of "falsity" under Section 10(b) and Rule 10b-5 because Defendants' statements were true at the time they were made. Defendants are incorrect. Ninth Circuit case law is crystal clear that even a "literally true" statement can still be "misleading and thus actionable under the securities laws." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 796 (9th Cir. 2017) (internal quotations omitted). This is especially true in scenarios where, as here, a defendant's statements conceal known, adverse facts giving rise to "serious doubts" that undermine the veracity of a statement. *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Courts within the Ninth Circuit and elsewhere frequently apply this rule when denying motions to dismiss in cases where, like here, defendants conceal risks concerning NDAs filed with the FDA. *See* Section III.A.2., *infra*.

Defendants' other primary argument challenges Plaintiff's allegations of "scienter." They attack Plaintiff's theory as "mak[ing] no sense" because a drug company would never invest time and money in an NDA that, for whatever reason, is "doomed to failure." The "only logical inference to be drawn," Defendants argue, is that the FDA abruptly changed its mind in terms of what was required for the FINTEPLA NDA. Defendants are incorrect on this point too. First, as is evident from the holdings in any number of securities fraud cases against biopharmaceutical companies, drug companies can and do commit securities fraud in connection with statements about their NDAs and/or clinical trial data. Thus, the Court should reject Defendants' argument, as its logical conclusion would mean that defendants like Zogenix could never commit securities fraud.

Second, Defendants' argument misses the point of Plaintiff's allegations. Defendants violated the securities laws when they concealed Zogenix's decision to exclude the fenfluramine references from the FINTEPLA NDA. While the company may have hoped or believed that its clinical data was strong enough to "adequately address" the FDA's safety concerns, omitting the references required by Section 505(b)(2) nevertheless exponentially elevated the risks associated

with the NDA. "There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable." *In re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455 BTM(NLS), 2003 U.S. Dist. LEXIS 7667, at *12-13 (S.D. Cal. May 1, 2003); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble--concealing bad news in the hope that it will be overtaken by good news--fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

It makes little difference at this stage *why* Zogenix excluded the fenfluramine literature from its NDA. Perhaps the company did so to avoid negative associations with Fen-Phen, a desire to cut corners, or proceed solely with their own studies rather than associate with prior studies. What matters is that Zogenix did not include the references and then Defendants concealed that decision from investors. As a result, Defendants deprived analysts and other sophisticated investors from being able to accurately assess the risks associated with investing in Zogenix. That counts as securities fraud.

II.    **STATEMENT OF FACTS**

A.    **Defendants Promoted Zogenix and FINTEPLA based on Section 505(b)(2) Eligibility.**

Zogenix's lead drug candidate is FINTEPLA. ¶24.[1] FINTEPLA's core ingredient is fenfluramine, the same ingredient used in the banned appetite-suppressant drugs Pondimin and Fen-Phen. ¶24. In 2015, when Farr and Zogenix's other executives first began discussing publicly the company's plans for developing FINTEPLA, they told investors that the company would be able to benefit from fenfluramine's history by filing its NDA under Section 505(b)(2). For example, Farr and Zogenix's Executive Vice President and Chief Development Officer, Gail Farfel, emphasized that the FDA had "confirmed that a 505(b)(2) path for the NDA submission [was] acceptable" and that Zogenix had "confirmed the 505(b)(2) NDA pathway in the United States"

---

[1] Citations to "¶__" refer to paragraphs in Plaintiff's Amended Complaint for Violations of the Federal Securities Laws dated September 10, 2019 (Dkt. No. 42) (the "Complaint").

with the FDA. ¶48. Defendants reiterated this message again and again throughout FINTEPLA's clinical trial period, including it in the company's filings with the SEC and private conversations with analysts. *E.g.*, ¶47 (annual report for fiscal 2017 representing that Zogenix would "rely upon published literature and the FDA's previous findings of safety and effectiveness" when filing its NDA under Section 505(b)(2)), ¶49 (Brean Capital reporting that "management . . . confirmed" Zogenix would file fenfluramine literature in accordance with Section 505(b)(2)).

Clearance to file under Section 505(b)(2) was critical, especially for a nascent drug company like Zogenix. By filing under Section 505(b)(2), Zogenix was able to simply reference pre-existing public literature on fenfluramine and avoid the expense, delay, and, importantly, risk of conducting numerous studies that are ordinarily required when filing an NDA. ¶¶4, 32, 47 (" . . . Zogenix was filing the NDA under Section 505(b)(2) in order to take advantage of and incorporate the existing toxicology data and literature concerning fenfluramine."). At the time, analysts and investors alike recognized Zogenix's Section 505(b)(2) strategy as a substantial and significant benefit for the company. *See* ¶49 (analyst reporting, based on communications, that "management . . . confirmed" their regulatory strategy of filing under 505(b)(2), and that the NDA would "reference information (mainly non clinical data) from the literature"). The market estimated FINTEPLA was capable of generating $2 billion in sales. ¶26. Without the added delay or risk of additional studies, Zogenix's pathway to profitability was stronger than most development-stage biopharmaceutical companies. Indeed, based upon its ability to take advantage of Section 505(b)(2) and market estimates for FINTEPLA sales, Zogenix raised nearly $300 million in capital from a public offering just six months before the Class Period. ¶¶26-27.

**B.    In an About-Face, Defendants Excluded the Fenfluramine Literature from the FINTEPLA NDA Despite the Extreme Risk of Rejection and Without Any Warning to Investors.**

On February 6, 2019, the start of the Class Period, Defendants announced that Zogenix had "completed its rolling submission" of its Section 505(b)(2) NDA to the FDA for FINTEPLA. ¶30. Absent from the announcement, *and contrary to what Zogenix had been telling investors for the previous four years*, the NDA did not include the public literature on fenfluramine's toxicity. ¶¶5,

45, 46. Excluding the fenfluramine literature from the NDA created an extreme risk that the FDA would reject Zogenix's application out of hand. Section 505(b)(2), by definition, required the NDA to incorporate "published literature." ¶31 (quoting FDA guidance for Section 505(b)(2) applications); *see also* ¶34 ("FDA may refuse to file an NDA" if it is "is incomplete because it does not on its face contain information required under section 505(b)," 21 C.F.R. §314.101(d)(3)). By not including the fenfluramine literature, Zogenix all but guaranteed that the FDA would "refuse to file" the NDA for failing to meet the FDA's threshold requirements. ¶¶31-35. Zogenix's decision to exclude the literature from the FINTEPLA NDA exponentially elevated the risk of its rejection, unbeknownst to Plaintiff and other unsuspecting investors. ¶¶8, 50, 69.

Defendants kept this information concealed from investors for about two months. During this time, the company provided additional information about its FINTEPLA NDA, but never disclosed that it had excluded the fenfluramine public literature required under Section 505(b)(2). For example, in its 2018 annual report filed on February 28, 2019 (signed by Farr and Zogenix's Chief Financial Officer, Defendant Michael P. Smith), Zogenix reiterated that it had filed its NDA pursuant to Section 505(b)(2), stating again that the company "completed [its] rolling submission of a NDA with the FDA . . . for Fintepla" and that "Section 505(b)(2) . . . would allow an NDA we submit to the FDA to rely in part on data in the public domain . . . , which could expedite the development program for our product candidates . . . ." ¶54. Though the annual report contained general disclaimers such as that the FDA could require the company to "conduct additional pre-clinical and clinical studies" or "to perform new studies," it again made no mention that Zogenix had "completed" its Section 505(b)(2) application with no reference to the literature on fenfluramine's toxicity, *i.e.*, the cornerstone of the Section 505(b)(2) NDA. ¶¶54-56. Farr echoed the same misleading representations about Zogenix's facially deficient and incomplete NDA later in the day during an investor conference call. ¶¶57-58 (discussing Zogenix's "completion of the rolling submission of an NDA to the [FDA]").

**C.       The FDA "Refused to File" the FINTEPLA NDA and Zogenix's Stock Price Plummeted as the Market Reassessed Risk.**

On April 8, 2019, Zogenix announced that the FDA had rejected the NDA for FINTEPLA. ¶36. To date, Zogenix has not disclosed a copy of the RTF letter to the public. Zogenix instead provided investors with the following description: ". . . certain non-clinical studies were not submitted to allow assessment of the chronic administration of fenfluramine . . . . The FDA has not requested or recommended additional clinical efficacy or safety studies." Defs. Br. at Ex. 4.[2] News of the rejection prompted an immediate and severe decline in the price of Zogenix's stock resulting in a one-day market capitalization loss of nearly $500 million. ¶¶40, 72.

Zogenix initially blamed the FDA for rejecting its NDA, claiming that the decision was "unexpected" because the FDA had never asked for non-clinical studies in the first place. Defs. Br. at Ex. 4 (press release announcing RTF letter). However, market analysts researched the issue and, after interviews with management, confirmed that Zogenix was in fact the party responsible for the bombshell. Based on conversations with management, analysts reported the shocking revelation that Zogenix's FINTEPLA NDA had omitted the required references to the existing fenfluramine literature. ¶37 (six- and nine-month toxicity studies under ICH). Specifically, Guggenheim Securities stated it was "puzzl[ed] . . . how this important detail in the non-clinical package was missed," especially in light of Zogenix's "regular dialogue" with the FDA. ¶39. Ladenburg Thalmann also questioned why the literature was omitted, noting that "fenfluramine was approved in 1973 for weight loss, so the [FINTEPLA] NDA was filed under the 505(b)(2) regulatory pathway" for the purpose of "allowing the applicant to rely upon the non-clinical evidence from the original NDA approval." ¶51. Similarly, Northland Capital Markets reported that ***the FDA had told Zogenix there was no need for new non-clinical toxicology studies***, "as the NDA for [FINTEPLA] was filed using the 505(b)(2) pathway that would allow inclusion of toxicology data from NDA of fenfluramine, i.e., Pondimin® filed in 1972." ¶51.

---

[2] A second basis existed for rejecting the NDA, but it is not relevant to this litigation.

The market was stunned by Zogenix's failure to include the references. Over the next several weeks, Farr attempted to explain why the company did what it did. In doing so, however, it became clear that Defendants intentionally omitted the fenfluramine literature and then deliberately and/or recklessly concealed that decision from investors. On April 8, 2019, while discussing the FDA's RTF letter, Farr confirmed that the company knew about the fenfluramine public literature in advance of filing the NDA. ¶65 ("[w]e know that there are literature data on chronic toxicology with fenfluramine based upon the prior NDA for [Pondimin]"). On May 8, 2019, he admitted Zogenix could have included the literature in the NDA because it had been "published in the peer review" databases with "the findings from all the chronic toxicity studies." ¶66. Moreover, on May 8, 2019, Farr shockingly confessed that "[they] were keenly aware of the past history of fenfluramine" and "*were going to* reference the chronic toxicity from the old Pondimin days, reference it through literature," but ultimately decided against doing so in hopes that the company's clinical data "adequately addressed" the need for including it. ¶¶67-68 (emphasis added).

Farr's admissions demonstrated to investors that Zogenix had intentionally excluded the fenfluramine literature from the NDA that was required under Section 505(b)(2), and then kept that fact hidden until the FDA rejected the NDA. On June 27, 2019 Zogenix confirmed that it would be resubmitting its NDA for FINTEPLA in late September 2019, with the very "additional clinical and non-clinical literature" related to toxicity of fenfluramine that was not included initially. ¶¶42-44.[3] This time, analysts double-checked. On June 27, 2019, after confirming, PiperJaffray reported that Zogenix's management said they would be amending the NDA "to include historical chronic toxicity data" that was omitted from the first NDA. ¶43.

---

[3] Defendants omit this fact from their brief, but include the June 27, 2019 press release announcing Zogenix's decision to resubmit the NDA for FINTEPLA in their accompanying exhibits. Defs. Br. at Ex. 7. In the paragraph below the highlighted portion in Defendants' exhibit, the press release states: "'We are very pleased with the outcome of our meeting with the FDA and appreciate their thoughtful approach in considering the totality of the data from our drug development program, *along with additional clinical and non-clinical literature that will be referenced in our resubmission*,' said Stephen J. Farr, Ph.D., President and CEO of Zogenix." *Id*. (emphasis added).

## III.    ARGUMENT

### A.    Defendants Violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

#### 1.    Legal Standard.

On a motion to dismiss, "[d]ismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (internal quotations omitted). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id*. (internal quotations and alterations omitted). "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Id*. at 998 (citing FED R. CIV. P. 12(d)); *see also*, *e.g.*, *Fabbri v. Wilkinson*, No. CV 19-1643 FMO (AGRx), 2019 U.S. Dist. LEXIS 192859 (C.D. Cal. Nov. 5, 2019) (denying motion to dismiss without prejudice for referencing materials outside the pleadings).

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which the plaintiff relied; (5) economic loss; and (6) loss causation. *See Matrixx Initiatives Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011). Defendants only challenge two elements of Plaintiff's securities claims: a material misrepresentation or omission of fact; and scienter. Defendants concede the adequacy of the other elements (including loss causation). The sole rationale mentioned for dismissing Plaintiff's Section 20(a) claim is the purported lack of a predicate violation. But, as shown herein, Plaintiff adequately pleads a Section 10(b) claim.

#### 2.    The Complaint Adequately Pleads Materially Misleading Omissions.

For claims predicated on misleading statements or omissions, the PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u4(b)(1)(B). A statement or omission "is misleading if it would give a

reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38.

Defendants' statements to the market—in the February 6, 2019 announcement, the 2018 annual report filed February 28, 2019, and by Farr on the February 28, 2019 investor call—that Zogenix had "completed its rolling submission" of its long-awaited NDA for FINTEPLA materially misled investors because Defendants failed to disclose that the NDA had excluded the fenfluramine toxicology literature. ¶¶46, 55, 58. This literature was the very basis of the Section 505(b)(2) "public literature" pathway that Defendants had continually told the market they would pursue. ¶¶47-49. Indeed, besides the repeated assertions of having "completed" the NDA, the 2018 annual report again prominently indicated (echoing what Farr said prior to the Class Period) that Zogenix was seeking NDA approval "through the Section 505(b)(2) regulatory pathway" and that such a submission entailed allowing Zogenix to "rely in part on data in the public domain" to save time and costs. ¶54. Defendants' failure to disclose that they ***had already excluded*** the fenfluramine literature – while fostering the impression they had submitted such literature in line with Section 505(b)(2) – was a glaring omission that wholly undermined their representation of having "completed" a submission, as it was virtually assured the submission would be rejected as incomplete. Reasonable investors, along with market analysts, were thus misled into believing Zogenix had submitted an NDA pursuant to Section 505(b)(2) with ordinary prospects of approval when, in reality, the NDA carried with it an extraordinarily heightened risk of rejection. ¶¶8, 50, 56, 58 ("By creating and then concealing this risk, Defendants subjected investors to undisclosed, material and negative circumstances . . . .").

U.S. Supreme Court and Ninth Circuit precedent strongly support Plaintiff's theory of liability. In *Matrixx Initiatives Inc. v. Siracusano*, *supra*, the Supreme Court held that the plaintiffs adequately pleaded that defendants made misleading statements that omitted a significant risk to

the viability of the company's leading product, despite the defendants' contentions that the omitted facts were immaterial and the problems at issue were not significant. 563 U.S. at 40, 47. Here, Defendants told investors they would pursue the Section 505(b)(2) pathway, which required submission of public literature, and then concealed that they determined not to submit it. *See id.* at 44-45 (duty to disclose triggered by choosing to make statements that can mislead investors).

Similarly, in *Lloyd v. CVB Financial Corp.*, *supra*, the Ninth Circuit held that the plaintiff adequately pleaded "falsity" where a defendant bank indicated it had no serious doubts about a borrower's ability to repay loans, despite the defendants' contentions that they believed the borrower would be able to do so. 811 F.3d at 1207-08. Importantly, the Ninth Circuit reasoned that, "[t]he SAC need not allege, however, that CVB actually believed that Garrett was about to go bankrupt, only that CVB was on notice of facts that would reasonably give rise to 'serious doubts' about Garrett's ability to repay." *Id*. at 1208. The same logic applies here, where Defendants knew that the fenfluramine literature was not included in the NDA and, therefore, were on notice of facts reasonably giving rise to "serious doubts" about the NDA's approval. *Id*. at 1209.

Defendants' primary argument is that their statements were not "false" but literally true. Defs. Br. at 11-14. However, black-letter law prohibits not only false statements, but also any omissions of "material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5; *Matrixx*, 563 U.S. at 44. As the Ninth Circuit has long recognized, a company's public statements cannot be analyzed in isolation, and "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d at 796.

Thus, where, as here, a company issues statements it contends are literally true, but conceals from investors significantly heightened risks of a drug's rejection by the FDA, liability will follow. The Ninth Circuit recently emphasized this point in *Khoja v. Orexigen Therapeutics, Inc.*, *supra*. There, the Ninth Circuit held that "[e]ven if a statement is not false, it may be misleading if it omits

material information." 899 F.3d at 1008-09. The Court found that defendants' statements about a drug's "interim results" materially misled investors because, while not "false," they omitted the fact that the FDA indicated to defendants the results were unreliable, thus increasing the risk of later rejection. *Id*. at 1010. The holding in *Orexigen* applies equally here, where Defendants' statements misled investors into believing their NDA was proceeding as Section 505(b)(2) application based on public literature regarding fenfluramine, the FDA had told Zogenix that the NDA for FINTEPLA needed to reference the fenfluramine literature in order to be accepted under Section 505(b)(2), and Defendants ultimately chose not to submit that literature, greatly increasing the risk of rejection. *E.g.*, ¶¶47-49, 51. It would have been elementary for Defendants to disclose, in discussing their submission, that they had opted not to include the public literature, but to rely on the strength of their clinical data (as Farr later admitted). ¶67. They chose not to though, and thereby grievously misled the market.

Other courts have sustained similar claims, on similar facts, and rejected similar arguments to those raised by Defendants here. In sum, where a drug company misleads the market as to the true risks concerning its operations, liability will follow. *See*, *e.g.*, *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 801-02 (C.D. Cal. 2011) (finding liability where, as here, defendants publicly stated they would use a particular regulatory approach that would help with approval but omitted that the regulatory approach substantially increased risk of rejection); *In re Nuvelo, Inc.*, 668 F. Supp. 2d 1217, 1221, 1230 (N.D. Cal. 2009) (defendants "misled investors by failing to divulge [the company] had an agreement with the FDA that regulatory approval rested on achieving a much higher threshold for statistical significance" and "failure to disclose SONOMA-2's more stringent statistical standard misled investors about the likelihood that SONOMA-2 would succeed;" plaintiffs "need not allege that defendants knew SONOMA-2 would fail; [plaintiffs] need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA-2 would fail."); *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 7667, at *12-13 ("There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable."); *In re Viropharma, Inc., Sec.*

*Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *17-19 (E.D. Pa. Apr. 3, 2003) ("[w]hether the [d]efendants had to predict the FDA's decision is irrelevant" but defendants breached their "duty not to make material misstatements" by failing to disclose adverse "drug interaction action data from [a] six-week prophylaxis study" that undermined company's ability to secure FDA approval "which formed the basis for its investors' perceptions").

### a)    Plaintiff adequately alleges the omitted facts.

Defendants argue in the alternative that Plaintiff's allegations are "speculative," claiming in particular that Plaintiff has failed to adequately support the claim that the FINTEPLA NDA did not include the required fenfluramine literature references. Defs. Br. at 3, 14-16. Defendants are wrong. Farr's own description of the RTF letter, subsequent analyst reports, and later admissions by Farr provide a solid foundation for Plaintiff's allegation. As discussed above in Section II.C., analysts spoke with Zogenix's management immediately after the news and, based on these conversations, reported that the NDA in fact did not include the necessary references to the fenfluramine literature. ¶¶39, 51. Farr ultimately admitted in later public statements that Zogenix was "keenly aware of the past history of fenfluramine," had access to the literature given that it had been "published," and was in fact "going to reference" it but decided not to in hopes of the company's clinical data "adequately address[ing]" the FDA's concerns. ¶¶65-67. As if any additional proof was needed, Zogenix confirmed that the literature had been excluded when it announced that it would be filing the "non-clinical literature" as part of its resubmission. ¶42. Defendants' own admissions provide more than enough support for Plaintiff's allegations at the pleading stage. *See Khoja*, 899 F.3d at 1008 (dismissal appropriate "only where the complaint lacks . . . sufficient facts to support a cognizable legal theory"). Accordingly, the Court should accept Plaintiff's account of the facts and reject the counter-narrative suggested by Defendants that the FDA was somehow to blame or that it rejected the NDA for a reason other than Zogenix's failure to include the required fenfluramine references. Defs. Br. at 14-15.[4]

---

[4] The Court should not overlook the import of the analyst reports cited by Plaintiff. The reports support Plaintiff's allegations as well as undermine (and contradict) Defendants' current arguments. For example, Defendants suggest that the FDA rejected the NDA because Zogenix did not include *new* non-clinical studies. Defs. Br. at 14-15. However, according to Northland Capital Markets, the

Defendants' reliance on *Kader v. Sarepta Therapeutics, Inc.*, No. 1:14-cv-14318-ADB, 2016 U.S. Dist. LEXIS 46025 (D. Mass. Apr. 5, 2016), does not change the outcome on this issue. Defs. Br. at 15-16. The plaintiff in that case attempted to allege a securities fraud claim by contrasting the defendants' public statements with "interim" communications from the FDA. *Kader*, 2016 U.S. Dist. LEXIS 46025, at *55. The court held that the "interim" communications did not qualify as adverse material information and, therefore, could not substantiate the plaintiff's theory of omission liability. *Id*. Plaintiff does not allege a failure to disclose an "interim" communication from the FDA. To the contrary, Zogenix consistently disclosed what the FDA was requiring for the FINTEPLA NDA, *i.e.*, the fenfluramine public literature. ¶¶47-49, 51. Defendants' liability arises from their decision to disregard this requirement and not tell anyone, thus subjecting Plaintiff to an unknown elevated risk of rejection.

Defendants' remaining authority on this point fails for the same reasons. Defs. Br. at 16. In *In re PTC Therapeutics, Inc., Securities Litigation*, No. 16-1124 (KM) (MAH), 2017 U.S. Dist. LEXIS 137930, at *28-29 (D.N.J. Aug. 28, 2017), the court dismissed one aspect of the plaintiffs' claims because plaintiffs failed to specify the "additional" information the FDA supposedly told the company it needed to provide. In *In re Regulus Therapeutics Inc. Securities Litigation*, No. 3:17-cv-0182-BTM-RBB, 2019 U.S. Dist. LEXIS 152443, at *19-20 (S.D. Cal. Sep. 5, 2019), the plaintiffs failed to specify what exactly the "preclinical and nonclinical results" showed that should have alerted the defendants of a heightened risk for rejection. Unlike the plaintiffs in those cases, Plaintiff here specifies exactly what was excluded from the FINTEPLA NDA that gave rise to the elevated risk of rejection—references to the existing fenfluramine toxicity literature and, in particular, the six- and nine-month toxicity studies under ICH. ¶37. Moreover, *PTC Therapeutics* sustained claims on similar facts. *Id.* at *42 (finding liability where company received "refuse-to-

FDA told Zogenix in writing **not** to include new non-clinical studies because the NDA would be referencing the existing fenfluramine literature under Section 505(b)(2). ¶51. Accepting the information from the analyst reports, Defendants cannot credibly argue that they were unaware of the public literature requirement (even putting aside the plain language of Section 505(b)(2) which explicitly requires it). *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (crediting allegations based on hearsay from media reports because, "[e]ven under the [PSLRA], plaintiffs are only required to plead facts, not to produce admissible evidence").

file" letter for insufficient data where it made misleading statements concerning sufficiency of that data).

### b) Defendants' risk warnings were insufficient and misleading.

Defendants' contention that their statements warned of the risks and uncertainties associated with their NDA is unavailing. Defs. Br. at 13-14. The "warnings" Defendants cite are boilerplate, obligatory disclaimers that the FDA may reject the NDA, or otherwise tell investors nothing about the relevant material facts truly at issue, and in many instances are themselves misleading. *See, e.g., Khoja*, 899 F.3d at 1010 (sustaining claims despite cautionary warnings, which did not adequately inform of specific risk that interim results were likely unreliable, increasing risk of rejection); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d at 797-98 (general disclaimers did not address investors' specific concerns); *MannKind*, 835 F. Supp. 2d at 817 ("[a]lthough Defendants repeatedly cite to these warnings as evidence that investors were fully aware of the risks inherent in the approval process, the warnings …were limited to rather boilerplate language concerning the risks inherent in that process and do not address [the omissions at issue]").

Defendants' "cautionary language" suffers from the same flaw as the ones before the Ninth Circuit in *In re Quality Systems*, 865 F.3d 1130 (9th Cir. 2017), *i.e.*, the risks at issue had already materialized. For example, the statement that "[i]f the FDA does not conclude certain of our product candidates satisfy the requirements for [] Section 505(b)(2) . . . , or if the requirements . . . under Section 505(b)(2) are not as we expect, the approval pathway . . . will likely stake significantly longer" because "we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval" does not shield Defendants from liability. Defs. Br. at 14. Boilerplate statements that Zogenix was "waiting to hear whether the FDA would accept its NDA for review" and, therefore, "made clear that acceptance was not guaranteed" also fail. Defs. Br. at 17. These statements do not disclose that Defendants, knowing and having told investors that the public literature was the basis of the Section 505(b)(2) application, took an immense risk in submitting their NDA without the public literature. In other words, the risk Defendants were purportedly warning against had ***already materialized*** as a result of Defendants' decision to exclude the fenfluramine literature from the NDA. *See In re Quality Sys.*, 865 F.3d at

1148 ("virtually no cautionary language" can shield misrepresentations or omissions of present fact); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) ("once defendants chose" to address a particular topic, "they [are] bound to do so in a manner that wouldn't mislead investors"); *Siracusano v. Matrixx Init., Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (holding "risk factors" actionable where SEC filing "speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition'"); *Berson*, 527 F.3d at 986 (cautionary language misleading where investors told that contract cancellations "may" occur even though facts suggested contracts were "at serious risk of being cancelled"); *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 U.S. Dist. LEXIS 83409, at *29, 31-33 (C.D. Cal. June 9, 2016) (holding numerous "risk disclosures" that purportedly "disclosed precisely" the risks complained of were themselves actionable as adverse facts increasing risks had already occurred).

Similarly, even if the risk had not yet fully "materialized" because the NDA had not yet been rejected (a narrow distinction to be certain), the risk disclosures relied upon by Defendants still "did not follow the firm's fortunes." *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 730-31 (7th Cir. 2004). In other words, Zogenix's cautionary language did not disclose that the company excluded the fenfluramine references, which would have communicated to investors a heightened level of risk in terms of the FINTEPLA's prospects for approval under Section 505(b)(2). *See id*. at 734-35 ("There is no reason to think--at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery--that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) 'important' sources of variance. . . . [T]he problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks."); *see also Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (reversing dismissal where "[d]efendants' cautionary language did not sufficiently address the harm that resulted"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015) ("Congress did not require the cautionary statement warn of 'all' important factors, so long as 'an investor has been warned of risks of a significance similar to that actually realized,' such that the investor 'is sufficiently on

notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'").

### c) Plaintiff does not allege "fraud-by-hindsight."

Given that Plaintiff has alleged contemporaneous knowledge of material adverse information, Defendants cannot rely on a "fraud-by-hindsight" argument either. Defs. Br. at 16-17. Failure to disclose an existing risk does not constitute "fraud-by-hindsight." *See In re Nuvelo, Inc.*, 668 F. Supp. 2d at 1230; *MannKind*, 835 F. Supp. 2d at 809 ("Defendants' argument [that plaintiffs relied on the FDA's refusal letter to support their claims] misses the mark. Fraud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements."). *In re Intrexon Corp. Securities Litigation*, No. 16-cv-02398-RS, 2017 U.S. Dist. LEXIS 26401 (N.D. Cal. Feb. 24, 2017), which Defendants cite, only illustrates that Plaintiff's allegations are ***not*** fraud-by-hindsight. Defs. Br. at 17. In that case, the plaintiffs relied solely on the market's reaction to a short-seller report to substantiate the short-seller's claim that the company's products were "overhyped," and that the defendants' statements misled investors as a result. *In re Intrexon Corp. Sec. Litig.*, 2017 U.S. Dist. LEXIS 26401, at *13-14. Here, Plaintiff does not "merely . . . point[] to a market reaction upon a subsequent disclosure of information" (*id.* at *14), but instead points to admissions from Farr that Zogenix knowingly and intentionally excluded critical information from the NDA that caused the FDA to reject it out of hand. ¶¶65-67. Plaintiff's narrative does not run backwards, but begins before the Class Period and continues throughout.

Defendants also argue that they should not be held liable for "fail[ing] to predict" the FDA's decision to reject the NDA. Defs. Br. at 17-18. This is a baseless mischaracterization of Plaintiff's theory of liability. As the Complaint makes abundantly clear, Defendants misled investors by concealing facts giving rise to a substantially elevated risk that the NDA would be rejected; namely, that Zogenix had excluded the fenfluramine literature references. *E.g.*, ¶8. Defendants could have easily disclosed that they had opted not to include the public literature when discussing the NDA, but instead chose to rely on the strength of their clinical data (as Farr later admitted). ¶67. By concealing known adverse information, Defendants misled the market. Accordingly, Defendants

cannot credibly argue that they adequately warned Plaintiff of the risk at hand or that Plaintiff is alleging "fraud by hindsight." Defs. Br. at 13-14, 16-19.

Defendants' reliance on *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), does not change the outcome on this point. Defs. Br. at 17-18. In *Tongue*, the plaintiffs attempted to hold the defendants liable for not disclosing information contained in "interim" communications from the FDA and, more importantly, that the information contained in the communications conflicted with the defendants' public statements. *Tongue*, 816 F.3d at 211. That is a markedly different fact pattern than the one at hand. Defendants did not hide the FDA's communications from the public; to the contrary, they made it very clear what the FDA was requiring for the FINTEPLA NDA, *i.e.*, the fenfluramine public literature. ¶¶47-49, 51. Defendants' liability arises from their decision to disregard this requirement and not tell anyone, thus subjecting Plaintiff to a known elevated risk of rejection. For that reason, unlike *Tongue*, the statements at issue are not "opinions," but instead misleading statements of fact concerning Zogenix's NDA. *See Shanawaz v. Intellipharmaceutics. Int'l Inc.*, 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018) (denying motion to dismiss where "case is thus unlike those in which a drug manufacturer is alleged to have 'stated [an] opinion about [a drug's] trial results . . . [and] the FDA disagreed with Defendants' interpretation of the data." . . . Instead, [Plaintiffs] allege that there was no such data to interpret, because IPCI never … submitted the described studies to the FDA, despite having told the public otherwise[,] constitu[ing] actionable misrepresentations").[5]

### 3. The Complaint Adequately Pleads Defendants' Scienter

The relevant inquiry when considering scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

---

[5] Defendants' other cases on this issue fail for the same reason. Defs. Br. at 18 (citing *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-cv-01048-TWP-MJD, 2016 U.S. Dist. LEXIS 673, at *35 (S.D. Ind. Jan. 4, 2016), and *Scandlon v. Blue Coat Sys.*, No. C 11-4293 RS, 2013 U.S. Dist. LEXIS 10433, at *11 (N.D. Cal. Jan. 25, 2013), for premise that Defendants were not obligated to disclose "criticism" or "minute details" received from FDA). Neither case addresses a scenario where, like here, the defendants engaged in a deliberate course of conduct that exposes unwitting investors to a substantially greater risk than the one for which they bargained.

308, 323 (2007) (emphasis in original). The inference of scienter "need not be irrefutable . . . or even the most plausible." *Id*. at 324. A "strong inference" is merely one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. "[A] tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV090012AGANX, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010) (internal quotations omitted). "Where, as here, falsity and scienter are strongly inferred from the same set of facts, we may incorporate the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry, asking whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors." *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887 (9th Cir. 2018) (*quoting Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (internal quotation marks omitted)).

          a)        *Defendants engaged in a deliberate and reckless gamble.*

Plaintiff's theory of scienter is far more compelling than Defendants' explanation of non-culpability. Defendants were well-aware of the requirement to submit existing literature, as that was the touchstone of the Section 505(b)(2) application. ¶31 (quoting FDA guidance); *see also* 21 U.S.C. §355(b)(2); *Takeda Pharms., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 72 (D.D.C. 2015), *appeal dismissed and judgment affirmed on other grounds*, 691 Fed. Appx. 634 (D.C. Cir. 2016) (explaining that a 505(b)(2) application relies at least in part on studies previously submitted to the FDA in support of another "reference listed" or "pioneer" drug that were not conducted by the 505(b)(2) applicant). Yet, in spite of Section 505(b)(2)'s requirements, Defendants deliberately excluded the necessary references to the available public fenfluramine literature from the FINTEPLA NDA. ¶¶5, 36, 64.

This was a deliberate, reckless gamble. At the time of filing the NDA, Farr **admitted** that Zogenix knew about the public literature on fenfluramine (¶65), had access to it (¶66), and was even "going to reference" it (¶67). However, the company bet that its clinical data "adequately addressed" the FDA's safety concerns relating to fenfluramine's chronic toxicity. ¶68. Notably, neither then nor now, Defendants do not claim that the FDA gave any green-light to drop the fenfluramine literature, and the FDA's immediate rejection of the NDA evidences that one did not

exist. By omitting the fenfluramine references, Zogenix exponentially increased the likelihood that the FDA would reject the FINTEPLA NDA. ¶69. Defendants concealed this risk from Plaintiff and other similarly situated investors and, for that reason, acted with scienter. *See, e.g.*, *Schueneman*, 840 F.3d at 709 (strong inference of deliberate recklessness arose from defendants' alleged intentional withholding information material to the market's assessment of whether and when the drug might be approved); *MannKind*, 835 F. Supp. 2d at 811-12 (collecting cases where scienter exists because company conceals problems about product); *In re Nuvelo, Inc.*, 668 F. Supp. 2d at 1231 (scienter where "defendants concealed known risks of failure that, if disclosed, would have reduced the price of Nuvelo's stock to account for the greater risk of failure").

Defendants fall short when responding to these allegations. Their main defense appears to be one of ignorance, claiming that Plaintiff has not alleged any facts "undermining Zogenix's good faith belief that the NDA submission was complete." Defs. Br. at 20-21. This argument does not outweigh Plaintiff's inference of scienter. As previously explained, the crux of Section 505(b)(2) is the requirement to reference public literature; without the references, an applicant cannot avail itself of the abbreviated application procedure. ¶31 (citing FDA guidance). Plaintiff's allegations establish that this was known by Zogenix. On numerous occasions, the company confirmed that the FDA had approved Zogenix for a Section 505(b)(2) application and that the company would be using Section 505(b)(2) in order to expedite the NDA procedure for FINTEPLA. ¶¶61-63 (quoting statements from Farr and another Zogenix executive). In addition, according to Northland Capital Markets, the FDA told Zogenix verbally and in writing not to provide non-clinical toxicology in light of the company's ability to file under Section 505(b)(2) and include the "toxicology data from the NDA of fenfluramine . . . ." ¶51. After all this, Defendants cannot now claim that they honestly believed the references were not required. *See, e.g.*, *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("good faith error" undermined by fact that defendants were "sophisticated scientists running a regulated, publicly traded corporation"); *In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (motion denied where defendants had a "genuine belief" that the company would succeed).

Defendants' "good faith belief" is also undercut by Farr's admissions in response to the RTF letter. Although Defendants claim Plaintiff "resorts to blatant mischaracterization of Dr. Farr's remarks after the class period," the transcripts of those investor conference calls do not lie. Defs. Br. at 20-21. On May 8, 2019, Farr admitted that "we obviously, as part of our diligence, we were keenly aware of the past history of fenfluramine and wanted to balance that with the remarkable data that we generated . . . ." ¶67. He then admitted that "[w]e were going to reference the chronic toxicity from the old Pondimin days, reference it through literature . . . ." ¶67. When explaining why Zogenix did ***not*** reference the literature, Farr then admitted that the company "[felt] that with respect to a cardiovascular safety signal, which led to [fenfluramine's] withdrawal from the market, we adequately addressed that in our Phase III program." ¶68. Farr's statements further support Plaintiff's inference of scienter, as they show that Defendants made a deliberate decision to exclude the references from the FINTEPLA NDA, yet concealed that decision from investors. *See*, *e.g.*, *Amylin*, 2003 U.S. Dist. LEXIS 7667, at *12-13 ("There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.").

*b)*      *Blaming the FDA is not a viable defense.*

In an effort to avoid liability, Defendants attempt in their motion to blame the FDA. Defs. Br. at 22-23. They question why Zogenix would spend time and money on an application if they knew it had a high risk of failing, suggesting instead that "the only logical inference" is that the FDA said they could file the NDA without referencing the fenfluramine literature and then abruptly changed its mind. Defs. Br. at 22-24. This is a non-starter and should be rejected as such.

First, Defendants provide no support for this self-serving theory. Although Defendants are in possession of all communications from the FDA and have submitted numerous documents on this motion, they quote no statement of the FDA assuring them they were exempt from submitting the literature. At best, Defendants simply dispute facts alleged by Plaintiff, which is improper at the pleading stage. Courts have repeatedly denied motions to dismiss in similar situations—where, as here, defendants seek to lay blame at the feet of the FDA—rejecting virtually the same arguments

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CASE NO. 19-CV-1975
- 21 -

as proffered by Defendants here. *See, e.g., Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 980 (6th Cir. 2018) (reversing dismissal and rejecting argument that FDA "decided to change its positions regarding the necessity of [certain submissions]" or defendants "left the meeting with a different impression" of what FDA required, as "[n]either explanation . . . is more plausible than the knowing or reckless fraud alleged by Plaintiffs" because "[defendant] provides no reason why the FDA would have changed its position"); *MannKind*, 835 F. Supp. 2d at 809-10 (scienter pleaded based in part on "common sense inference that the FDA would not . . . 'agree to' that which it would reject several months later" and any such agreement, if it existed, would have been enforceable against the FDA); *see also FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 140 (E.D. Pa. 2018) ("The FDA is presumed to act in the public interest"); *Takeda*, 78 F. Supp. 2d at 97, 107-08 (on summary judgment, noting deference accorded to FDA's interpretation of statute including presumption it acted rationally); *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *18-19 (improper on motion to dismiss for court to take defendants' word for basis of FDA's decision to deny application).

Second, if Defendants were correct, then their argument would prevail in every single instance a drug company is accused of committing securities fraud. As the cases cited herein recognize, a company can spend time and money on an NDA and still be held to have violated Section 10(b) and Rule 10b-5, either intentionally or with deliberate recklessness. What Defendants overlook is that they misled the market by concealing the substantial risk they created, and not that they knew the NDA was doomed to fail. Indeed, "the simple fact that [Zogenix] had an explanation for its view" of whether to submit the literature "does not mean investors would not want to know" that it had not been submitted. *Schueneman*, 840 F.3d at 709. "Rather, [the] theory of fraud is that Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve" the drug. *Id.*; *see also Nuvelo*, 668 F. Supp. 2d at 1230 (plaintiffs "need not allege that defendants knew SONOMA-2 would fail; [plaintiffs] need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA-2 would fail.").

Defendants' case law is distinguishable on this point. Unlike the plaintiffs in *Cozzarelli v. Inspire Pharmaceuticals, Inc.*, 549 F.3d 618 (4th Cir. 2008), *City of Edinburgh Council v. Pfizer,*

*Inc.*, 754 F.3d 159 (3d Cir. 2014), and *In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), Plaintiff here is not alleging that Zogenix "'stake[d] its existence on a drug and a clinical trial that [Defendants] thought was doomed to failure.'" Defs. Br. at 22 (quoting *Cozzarelli*, 549 F.3d at 627). Instead, Defendants engaged in a "gamble" by concealing that Zogenix had excluded the fenfluramine references "in the hope that it [would] be overtaken by good news [that the FDA accepted the NDA based on Zogenix's Phase III data]." *See Makor Issues & Rights, Ltd.*, 513 F.3d at 710. Defendants hoped that the fenfluramine references would not be required in the face of the company's positive clinical data. While Defendants may have not known for sure whether the FDA would agree with them, they were not authorized to conceal this information from investors. *See Schueneman*, 840 F.3d at 707-08.

Defendants' other cases on this point are similarly distinguishable. Defs. Br. at 22-23. For example, in *In re Arrowhead Pharmaceuticals, Inc. Securities Litigation*, No. CV 16-08505, 2017 U.S. Dist. LEXIS 222580 (C.D. Cal. Dec. 21, 2017), the court faulted the plaintiff for failing to plead particularized allegations showing when the defendant first discovered the toxicity issues that were allegedly concealed, which is in stark contrast to the admissions from Farr which Plaintiff relies upon here. *Id.* at *8-10, 14-15. Further, the court noted that the "Defendant *had* in fact revealed concerns with the DPC's toxicity issues to investors, and had been doing so for years," which directly undermined the plaintiff's claims of non-disclosure. *Id.* at *7, 12, 18 (emphasis in original). That is not true here. The closest Defendants come to disclosing that they excluded the fenfluramine references are the boilerplate, obligatory disclaimers that the FDA may reject the NDA, which themselves were materially misleading given that they failed to disclose that the NDA excluded the literature references. *See* Section III.A.2.b, *supra*.[6]

---

[6] Given the inadequacy of the company's "risk disclosures," Defendants cannot rely on them to negate Plaintiff's inference of scienter. Defs. Br. at 25. The disclosures were general disclaimers telling investors nothing about the salient facts and severe risk complained of, *i.e.*, that, contrary to its representations, Zogenix had not submitted the requisite literature attendant to a Section 505(b)(2) application. *See Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-540 JLS (JLB), 2019 U.S. Dist. LEXIS 162366, at *47 (N.D. Cal. Sept. 23, 2019) ("Although the presence of cautionary language in the Form 8-K does give rise to an inference of nonfraudulent intent, . . . the inference that [defendants] acted with deliberate or conscious recklessness is at least as compelling").

          *c)*      *Plaintiff's theory of scienter is far more compelling than Defendants' attempt to scapegoat the FDA.*

When weighing the competing narratives, Plaintiff's allegations give rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Whether Zogenix excluded the fenfluramine references so to avoid potential negative associations with Fen-Phen (the appetite suppressant drug that the FDA banned in the late-1990s), a desire to cut corners, proceed solely with their own studies rather than associate with prior studies, or any other reason, is beside the point here. What matters is that they concealed their decision and, as a result, deprived analysts and other sophisticated investors from being able to accurately assess the risks associated with investing in Zogenix.

Notwithstanding, Defendants argue that they should not be held liable because Plaintiff has not alleged any "insider stock sales." Defs. Br. at 24. The Court should reject this argument. The Supreme Court has stated that allegations of motive are not required. *Matrixx*, 563 U.S. at 48 (citing *Tellabs*, 551 U.S. at 325). Moreover, Defendants' argument has been rejected by the Ninth Circuit and the Supreme Court. *No. 84 Empl.-Teamster Jt. Council Pension Tr. Fd. V. Am. W. Holding Corp.*, 320 F. 3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *Tellabs*, 551 U.S. at 325 (lack of insider stock sales not fatal). "Indeed, there are several [logical] explanations for why an individual defendant would not sell stock even if she knew about false [] statements, such as the desire to avoid drawing the market's attention to the problem." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016).

**B.**      **Farr and Smith Violated Section 20(a) of the Exchange Act.**

Defendants do not challenge Plaintiff's Section 20(a) claim except insofar as they challenge an underlying Section 10(b) violation. Defs. Br. at 1. Because Plaintiff has stated a Section 10(b) against Defendants, Plaintiff's Section 20(a) claim should be upheld as well. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[7]

Dated: November 19, 2019                    Respectfully submitted,

                                            **LEVI & KORSINSKY, LLP**

                                            */s/ Adam M. Apton*
                                            Adam M. Apton (SBN 316506)
                                            Adam C. McCall (SBN 302130)
                                            Email: aapton@zlk.com
                                            Email: amccall@zlk.com
                                            388 Market Street, Suite 1300
                                            San Francisco, CA 94111
                                            Tel.: 415-373-1671
                                            Fax: 415-484-1294

                                                        -and-

                                            Nicholas I. Porritt
                                            LEVI & KORSINSKY, LLP
                                            1101 30th Street N.W., Suite 115
                                            Washington, D.C. 20007
                                            Tel.: 202-524-4290
                                            Fax: 202-333-2121
                                            (*pro hac vice to be submitted*)

                                            *Attorneys for Lead Plaintiff Arnold Keijzer*
                                            *and Lead Counsel for the Class*

---

[7] Should the Court dismiss any aspect of the Complaint, Plaintiff respectfully requests leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").