**Pages 1 - 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

IMMANUEL LAKE, et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )      **NO. C 19-1975**
                                )
ZOGENIX, INC., et al.,          )
                                )
          Defendants.           )
                                )

                          San Francisco, California
                          Friday, February 7, 2020

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    LEVI & KORSINSKY LLP
                    388 Market Street - Suite 1300
                    San Francisco, California  94111
               BY:  **ADAM M. APTON, ATTORNEY AT LAW**

For Defendants:
                    LATHAM & WATKINS LLP
                    12670 High Bluff Drive
                    San Diego, California  92130
               BY:  **COLLEEN C. SMITH, ATTORNEY AT LAW**

Reported By:        Marla F. Knox, RPR, CRR
                    Official Reporter

**Friday - February 7, 2020**                              **2:28 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Calling Civil Case Number 19-1975, Immanuel Lake versus Zogenix, Incorporated.

Will Counsel please step forward and state your appearances for the record.

**MS. SMITH:**  Good afternoon, Your Honor, Colleen Smith of Latham & Watkins on behalf of Zogenix.  And at counsel table with me is my client Steve Johnson.

**THE COURT:**  Good afternoon.

**MR. APTON:**  Good afternoon, Your Honor, Adam Apton for Plaintiffs at Levi & Korsinksy.

**THE COURT:**  Good afternoon.  This matter is on for Defendant's Motion To Dismiss in its punitive class action securities case.

I have read through what you submitted to us.  I'm not going to give you a tentative decision on the motion, but I have some questions for you.

So instead I will let you just get started and reserve the right to interrupt you as you start through it.

Ms. Smith, you are the moving party so why don't you go ahead and begin the discussion.

**MS. SMITH:**  Great thank you, Your Honor.

Defendants believe the Motion To Dismiss should be granted

for three separate motions; two related, one not related.  So the first reason the Motion should be granted is that the Plaintiffs have not met their burden to plead falsity.

First, Plaintiffs haven't alleged specific facts that establish that Zogenix did not actually submit the chronic toxicity references.

**THE COURT:**  What do Plaintiffs do in this context where we are talking about a new drug application; and as I understand it, the Application is confidential at this juncture the RTF letter that emanates from the Agency is confidential. In those cases where the Courts have allowed the securities -- new drug application securities application case to proceed, how have the Plaintiffs been able to do that because they don't have access to that information?

Tell me about the cases that have satisfied the pleading requirements and have gone forward.

**MS. SMITH:**  Of course, Your Honor.  Most of those cases involve situations in which the FDA has either issued or refused to file a letter, like this one, or the NDA has gone all the way through the review process and has made it to the end of the line; and the FDA is now making a decision:  Will it approve the drug, will it not approve the drug.  The vast majority of the cases that the Plaintiff has cited fall into this latter category.  And when the FDA makes --

**THE COURT:**  Some of them involve confidential

witnesses, I assume?

**MS. SMITH:**  Some of them involve confidential witnesses as well.

**THE COURT:**  And do some involve admissions that are somehow otherwise obtained by the Plaintiffs?

**MS. SMITH:**  That's correct.

**THE COURT:**  Okay.

**MS. SMITH:**  Yes.  So when a drug goes all the way through the FDA review process, the FDA will release documents that have not previously been available to the public on its website; and that information then becomes available to Plaintiffs.

So the most common example is:  Drug company says, We didn't -- you know, says, This is our submission.  We feel optimistic about approval, and statements of that nature. Meanwhile -- or have said, We have submitted the F -- the Application and -- in conjunction with feedback we received from the FDA.

At the end of the line, documents are released.  So the drug is rejected.  Documents are released indicating that the FDA had given feedback to the company at some earlier point in the process saying, You need to run another study.  You need to achieve a specific p-value to show that your drug is safe and efficacious.  You need to do this.

Meanwhile, the company hasn't -- either has made

statements contradicting the thing that the FDA has been asking for or has issued overly optimistic statements the Plaintiffs have claimed are misleading by omission.

Different scenario than here.

So stepping back, Plaintiffs allegations regarding the submission of chronic toxicity -- references to chronic toxicity studies --

**THE COURT:**  The 6-month and 9-month studies?

**MS. SMITH:**  Correct.  Plaintiffs offer basically two factual bases for their assertion that the NDA did not include the references.

The first is a statement by the CEO of the company, Dr. Farr.  And it's quoted in several places in the Complaint misleadingly because the full quote is not provided.  The quote in essence is:  We were going to submit the references to these studies, and then Plaintiffs draw from that that they weren't actually submitted.

The Court should review the full quote -- and I might just read it for Your Honor if you will indulge me -- because it is clear if you read the entire quote, that what Dr. Farr is saying is this is what we were going to do until the FDA told us we couldn't do it this way.  You now need to conduct --

**THE COURT:**  Is the entire quote one of the items that you are asking to have included by virtue of incorporation by reference or judicial notice?

**MS. SMITH:**  That's correct, Your Honor, but Plaintiffs are --

**THE COURT:**  Which Exhibit number is it?

**MS. SMITH:**  It is 14 -- Exhibit 14 at page 5.  And the full quote essentially is:  We were going to reference the chronic toxicity from the old Pondimin days; reference it through the literature and then supplement that with non-clinical trials or non-clinical studies, I should say, with genotoxicity and juvenile toxicity which allowed us to really bridge from the non-chronic tox and allow us to start to dose children and then ultimately to move forward with reproductive toxicity and carcinogenicity testing as a post-market required study.

So all of that was basically laid out in our regulatory documentation.  So what he is saying is all of these things were in our NDA and that's what we were going to proceed to approval on, but now we have this refuse to file letter that is -- in which the FDA is telling us we now need to do more including these new studies that were not previously required.

So the full quote then gives you the full context.  And he is not saying, We didn't submit the studies.

He is saying, That was our original plan that then the FDA has now told us won't work.

**THE COURT:**  Well, again, this gets back to where this confidentiality of these materials makes it a bit problematic.

Are you representing now that these -- the six-month and nine-month toxicity studies you did submit or are you just saying they haven't shown we didn't submit it?  What are you saying?

**MS. SMITH:**  Yes, Your Honor.  So unfortunately as the Court knows, the Defendants hands are a bit tied at the motion --

**THE COURT:**  Are they tied?  I mean, are you precluded from actually stating one way or another?  There is a separate issue which is:  Is it going beyond the four corners of the complaint and all of those issues -- but just as a separate matter, are you foreclosed from disclosing?

**MS. SMITH:**  No, Your Honor.

**THE COURT:**  No.

**MS. SMITH:**  And I think the briefs -- we have disclosed this in the briefs.  I mean, the references to the chronic toxicity literature were included in the NDA.

**THE COURT:**  Well, you make that general statement; that then there is fenfluramine studies that are -- have been submitted.  Does that include the six-month and nine-month toxicity study?

**MS. SMITH:**  It does.  The -- it doesn't include the study -- the new study.  Remember that's what the FDA wanted the company to do.

**THE COURT:**  The -- according to you, the FDA says, You

need to go back and do some additional studies and submit them to us?

**MS. SMITH:**  Correct.

**THE COURT:**  Yeah.

**MS. SMITH:**  Right.  In the first instance you run them.  You can't rely just on the old studies.

**THE COURT:**  Understood, right.

**MS. SMITH:**  And the analysts are sort of --

**THE COURT:**  And your hope -- I'm sorry to keep interrupting -- but your hope on this 505 pathway was that because these prior studies had been done, you could satisfy -- that you could take advantage of the streamline process by submitting the former studies and you didn't have to do them yourself?

**MS. SMITH:**  That's correct, Your Honor, although one thing to clarify is the 505(b) pathway allows the company to refer to existing literature for a number of different required studies.  And, by the way, there is no normal set of studies that is required for every drug.  As you might imagine, every drug is a bit different; and the FDA has different requirements for different drugs, and it is based on a dialogue with the FDA.

Setting all that aside, that's correct.  The 505(b) pathway would allow an Applicant such as Zogenix to refer to existing literature in this case for fenfluramine.

And so if I might -- circling back to the Plaintiffs' allegations is -- the basis for Plaintiffs' allegation that the chronic toxicity studies were not referenced -- other than Dr. Farr's statement, the other evidence or alleged fact that the Plaintiffs point to is support for the fact that the studies were not referenced in the initial NDA, are the analysts reports.  And the Plaintiffs characterize those analysts as reaching the conclusion that the chronic toxicity studies were not referenced.

I would urge the Court to review those reports themselves because they do not actually say anything about whether the reports -- excuse me -- the studies were referenced or not referenced.

And if I might, one of the analyst reports -- the one that the Plaintiffs rely on most heavily, the Ladenburg Thalmann report -- actually is instructive and suggests that the analyst is concluding not that Zogenix didn't make the references in its initial NDA but, in fact, that it did make those references; and that those references were not sufficient for the FDA's purpose.

In fact -- this is Exhibit 10 is this analyst report.  And what the analyst actually says is:  We believe Zogenix's toxicity evidence was conducted before the current guidelines were issued.  Recall, fenfluramine was approved in 1973 for weight loss.  So the FINTEPLA NDA was filed under the

505(b)(2)pathway allowing the Applicant to rely on the non-clinical evidence from the original NDA approval.

So what he is saying is the studies -- the evidence that was submitted in support of the original NDA, those are old. They are from the 1970s. And what he is implying is maybe the FDA is now requiring Zogenix to do the new studies because they are new. There are new guidelines on how you conduct these studies as opposed to the way that they were conducted back in the '70s; but far from concluding that the studies weren't referenced, he is concluding the opposite. The evidence was there but now the FDA --

**THE COURT:** Let me stop and ask you, Mr. Apton, if at the end of the day when this information finally becomes public and it appeared -- it turns out that the studies that you have identified that you felt were -- according to your inferences here -- were held back and the marketplace should have been advised that they were holding it back, turns out they didn't hold it back, do you have any case left?

**MR. APTON:** I have no case.

**THE COURT:** Well --

**MR. APTON:** I mean, Your Honor, I need to clarify.

**THE COURT:** Well, before you do that -- the frustration of this case and this is -- you know, it seems particular to this area in the interplay of this confidentiality, but you are sort of talking across -- isn't it

in both of your interests -- I understand that you want to maintain confidentiality; but if, in fact, you did provide all of the information that they say you should have alerted the marketplace was not going to be provided, shouldn't -- isn't it in your interest to show them that material even though we are only at the pleading stage?

MS. SMITH: The answer to that is most certainly yes. Of course, I have to caveat that with this is a part of an NDA that is literally hundreds of thousands of pages long. I mean, these are huge because they include clinical trial data; has all of the underlying clinical trial data for the trials that are basis of the drug's approval. And typically those are not made public because they contain a lot of proprietary data. Now, obviously the references are a small portion of that.

THE COURT: Can that be handled with a non-disclosure agreement, an attorneys' eyes only, something that would be -- I mean, well, it seems like there is some basic factual questions that one way or the other it would be in everyone's interest if it was cleared up and people aren't guessing as this matter goes through iterations of pleadings.

MR. APTON: Your Honor, if I may, your intuition is on point because initially before the Motion To Dismiss was filed, there was discussion between myself and Defense Counsel -- not Ms. Smith but her partner -- they were going to seek judicial notice for the refuse to file letter and then abruptly changed

course.  They pulled it.

So they filed 14 -- 15 documents as exhibits, some of which were incorporated by reference, some not.  And then they decided to pull the RTF letter.  I think that says something.

**THE COURT:**  On the basis that it is confidential?

**MR. APTON:**  Well --

**THE COURT:**  I mean, is that what they are saying?

**MR. APTON:**  They didn't explain.  I don't know.

**THE COURT:**  I guess I just -- there may be an answer that I just don't understand, but it is just -- you can, perhaps, each of you answer why it shouldn't be frustrating to me that there is this disconnect in a case that I can see a scenario in which the parties are arguing about an actual situation that didn't exist, and that's a waste of time.

**MR. APTON:**  Your Honor, if I can explain why I know or I have alleged that these six and nine-month ICH studies were not provided, I think that -- for the purposes of this motion -- resolves the issue.

**THE COURT:**  Well, it doesn't necessarily resolve the issue.  All that does at least would tell us whether or not -- that resolves the question of whether or not your factual understanding is correct or not.  It doesn't answer the question whether or not that's a sufficient basis under either of the argument of falsity or scienter that you have pled enough.  That is a different question.

This one is a much more fundamental question which is:  Is your assumption correct from a factual perspective.

**MR. APTON:**  I see.  And --

**THE COURT:**  Do you agree?

**MR. APTON:**  Well, Your Honor, I would submit that --

**THE COURT:**  I mean, let me ask you this question, perhaps:  If, in fact, you are right that the -- that the six and nine-month toxicity studies were not provided to the FDA, is that what should have been -- you think that, in and of itself, the failure to disclose that that was their decision; that they were going to hold back, that's enough to have a securities violation?

**MR. APTON:**  Because of how critical these references to the public literature were to the NDA.  So these ICH studies -- as Defendant Farr referred to them and as analysts referred to them -- were "standard."  These were part and parcel of this end-day application which was being submitted under Section 505(b)(2).

**THE COURT:**  So under your theory, what should their public disclosures to the marketplace have said?  It should have been so specific as to say:  We, Zogenix, have elected not to provide with our NDA these specific studies because we don't think we need to do that?  That's what they should have said?

**MR. APTON:**  They should have said something along the lines of:  We have taken a calculated risk not to provide these

studies because we think our clinical data is sufficient.  It obviates the need to provide these toxicity studies relating to Pondimin, relating to fen-phen for whatever reason.  Doesn't matter whether they --

THE COURT:  You think the marketplace would have been sophisticated enough to have said:  Oh, that is such a risky proposition.  We think the FDA will deny the NDA.  So, therefore, I won't buy this stock?

MR. APTON:  I have four analysts in my Complaint that when this news broke, they went wild; Ladenburg, Northland Capital, Piper Jaffray -- I'm forgetting the fourth one, but it's -- when they discovered that this information wasn't provided, they were "puzzled."  They didn't understand why.  This was the plan all along.  The whole benefit of using the 505(b)(2) Application was to bypass the risk and cost associated with conducting these studies themselves.

THE COURT:  But the company, according to their position, is they made a judgment call that they were in a position to -- they were providing enough information so that they could get the benefit of it, and they were mistaken.  They were wrong.  But that's -- that's a judgment that they made.  So to -- and this jumps in ahead to the scienter point -- to buy your view of the world as it is stated here, they had to have an awareness that they were going down in flames and yet they went ahead with the NDA.

**MR. APTON:**  Absolutely not.  That's not what I'm saying.  I don't think any drug company invests in a drug or an application that is, quote, doomed to fail.

**THE COURT:**  Well, that's what you said.  And you said --

**MR. APTON:**  No --

**THE COURT:**  You said on page 10 of your opposition brief, as it was virtually assured the submission would be rejected as incomplete.  As it was virtually assured.  Are you -- so your position is they understood that it was virtually assured they would fail.  That makes zero sense, zero sense.

**MR. APTON:**  Your Honor, I agree.

**THE COURT:**  Well, that's your statement in the brief.

**MR. APTON:**  Well, "virtually assured" also means elevated the risk substantially.

**THE COURT:**  Well, that is pretty different than "virtually assured."

**MR. APTON:**  If I had wanted to speak in the absolutes, I would have said:  It was going to get rejected and they knew it.

So in the Complaint I explain the theory in, perhaps, better terminology.  I don't use the words "virtually assured," but I am very clear that their decision to hold back these six and nine-month studies, it elevated the risk substantially so

much so that the risk of a threshold rejection, an RTF, was likely.

THE COURT:  But you see, you are caught in a dilemma, I think, and you are -- with the scienter obligation that you have as well because you are -- unless it is virtually assured, then where this is, is that these -- that the company, perhaps -- and with hindsight we know -- made a bad judgment, but they honestly believed that they were going to be able to take advantage of the 505 pathway.  And if they honestly believed -- as it turns out incorrectly -- that they would be able to take advantage of that, you can't show scienter.

MR. APTON:  And, Your Honor, they would have to produce discovery, evidence in support of their good-faith honest beliefs and convince a jury of that.

THE COURT:  Well, no, but you have an initial pleading obligation to show that you have the more sufficiently strong demonstration of scienter.

MR. APTON:  Well --

THE COURT:  And if there is a benign explanation, which is -- the benign explanation is they wanted to get the approval and they thought they were going to have enough to get it and they were wrong, that's not scienter.

MR. APTON:  But the standard is at least as compelling.  So I need to -- the tie goes to me.  The tie goes to the runner.

**THE COURT:**  I'm not sure that's right actually.  I don't think the tie goes to the runner with scienter --

**MR. APTON:**  Well, under *Tellabs* it says at least compelling.

**THE COURT:**  Yes.  And then you combine that with the other language in the cases that says it has to be sufficiently strong.  It has to be a strong inference -- strong inference of scienter.

**MR. APTON:**  Your Honor, it is because in this situation we have Defendant Farr admitting -- or in my opinion.  Counsel disagrees with my interpretation of the May 15, 2019 transcript -- he says, We were going to submit this toxicology literature or references to the literature but we decided not to because we thought that our clinical data was strong enough.  And he goes on to talk about how --

**THE COURT:**  Isn't that entirely consistent with the notion that they thought they were going to get approval?

**MR. APTON:**  But the crux of my case is that there was a calculated risk -- there was a decision made behind closed doors that should have been communicated to investors, to the public in general.  Analysts would have picked up on it.  They would have notified the market in general and said, Hey, Zogenix is doing something that is arguably risky.  And the stock price -- the market would have factored that in.  The stock price would have decreased.

**THE COURT:**  But in order to plead that -- and I understand that you are hamstrung, as Plaintiffs often are, in this context -- but don't you need something like some internal document that says, Hey, you know -- this is an example -- you know, we have got about a 10 percent chance of getting this through, but we are going to do it anyway.  And -- but don't tell the market that it's really such a roll of the dice.  We are not going to tell them that it is, but we are -- you know, between all of us, we have got a really, you know, really slim shot at getting this approved.  You need something like that.

**MR. APTON:**  I don't need something like that, Your Honor.  That would be a fantastic fact.  And if I had it, I would be waiving it right now in my hand.  What I have here, though, is something that is arguably just as good given the theory that I'm pursuing; admissions by the CEO saying, We considered this.  This is why we considered it, and this is why we did what we did.  The data was available to us.  We knew about it, and we were going to do it but we decided not to because we thought our clinical data was sufficient even though this was a 505(b)(2) Application.

**THE COURT:**  But that's a -- that is sort of corroborating of the notion that they thought they were in a position to get this approved.  And maybe they were deluding themselves; but if that's what it is, that they deluded themselves and they made a very bad business judgment, that's

not scienter.

**MR. APTON:** But, Your Honor, the misrepresentation at hand is not in the statement saying, We think we are in a good position to get approval. It is not an opinion statement. The misrepresentation at hand is, We have submitted; we have completed our NDA filing. And absent from that statement is not their opinion as to their prospects for success but the fact that a critical piece of information was missing from that Application.

**THE COURT:** So, again, going back to what you think their public statement should have said, is it your position that their -- they needed in their public statement to elaborate on exactly what they were going to submit to the FDA and what they were not going to submit? I mean, what would -- what should the public statement have said or should the public statement have said something like a risk -- we think we have a 15 percent chance of getting this approved? Or what should it have said?

**MR. APTON:** Again, Your Honor, this is not about whether they -- the percentage or the prospects that they thought they had in terms of getting approval. It is a statement that discussed the NDA. So it triggered a duty to speak honestly and accurately under *Berson v Applied Technologies* and they didn't. They omitted an important piece of information. And, Your Honor, it is worth --

**THE COURT:** And to be specific, the important piece of information is you think they should have said, Hey, marketplace, we are not sending the six-month and nine-month toxicity studies to the FDA although it sounds like they are saying they did; but which frankly as you candidly admit, would kind of end your case right from the get-go.

**MR. APTON:** Your Honor, it is unclear whether Counsel actually confirmed that they referenced the public literature on that point, but initially there was -- well, anyway.

**THE COURT:** I mean, I will say that -- I mean, I'm not their lawyer, but I don't see a good reason why if, in fact, I heard that correctly, Zogenix shouldn't just disclose it to you. I mean, I don't understand why they wouldn't, but be that as it may.

**MR. APTON:** Maybe after this hearing, there will be a conversation.

**THE COURT:** Perhaps.

**MR. APTON:** If there is not, that certainly says something. But, Your Honor, the important thing here is that this six and nine-month ICH study is a very fundamental piece of information. It is not an ancillary item. It is as if by analogy Your Honor used an accountant to submit taxes on April 15th. Your accountant files the taxes but doesn't submit the check for your tax payment. Is it misleading if your accountant calls you and says, Judge, I filed your taxes? Yes.

Because the tax -- the check was not submitted with the taxes. I mean, that's a fundamental piece of information that undermines the overall impression that your accountant provided.

THE COURT:  Okay.  Let me go back to Ms. Smith on just -- we didn't cover -- you were talking about falsity, and then I went to Mr. Apton.  So I will go back to you and let you go ahead and address that as well.

MS. SMITH:  Of course, thank you, Your Honor.  Let me start back up with scienter since we spent a bit of time talking about that, and I want to hit a few more points beyond what we have already discussed.

So, first of all, the key issue here is the theory that Plaintiff is proceeding on -- as Your Honor has correctly articulated -- makes absolutely no sense.  If Zogenix knew there was a high risk that omitting references to existing literature would result in rejection of the NDA, why on earth -- why in the world would have omitted the references? This isn't a situation where Zogenix would need to conduct expensive -- potentially expensive additional studies.  This is just a matter of literally adding words to the NDA to refer to existing literature; something that could very easily be done.

THE COURT:  But to put their argument in the -- I think in the best posture for them, they are saying -- he is saying, I think, that -- has backed off on the notion that you

knew you were going to fail in front of the FDA, which was, I think, the part that I think is nonsensical; but I think the case really is more you -- you had a much clearer sense that it was -- it was going to be touch-and-go to get through the FDA; but you were willing to try -- for whatever reason, you wanted to make a run at it.  And what you didn't say to the marketplace was the degree of risk that you were taking.

But I think -- unless Mr. Apton can tell me I'm mistaken in taking this from what he said -- I think they have backed off from the idea that you knew you were going to fail because that's the part that doesn't make any sense.  It might make sense in a case, frankly, where there was insider trading allegations and others where it was terrible fraud here; people were going to get the money and run.  There isn't any allegation of that in here.

**MS. SMITH:**  Right, exactly.

**THE COURT:**  So it really is -- the part that doesn't make sense is that you would have set yourself up for failure, but there is space less than that where you were gamblers and you didn't tell the marketplace you were gambling.

**MS. SMITH:**  That's correct, Your Honor, except that it would make no sense for a company like this to gamble at all with the NDA.  I mean, an NDA is the most important thing in a life sciences company's life cycle.  This is how it makes money, right.  You have to get the drug approved.  And

companies don't want to gamble with that.  They want to be assured that they will receive approval.

So it what makes no sense is even if there is a risk -- not a certain rejection but a significant risk of rejection -- why wouldn't references to existing literature go into the NDA? Again, it is an easy thing to do.  It is just words on a page that you refer to existing studies.  Doesn't cost money. Doesn't take time.  It is just a reference.

So the idea that Zogenix appreciated a risk that excluding that information would be -- would result in a gamble in connection with its NDA and yet took a calculated risk not to make those references, it just doesn't make any sense.  And then --

**THE COURT:**  Again, just so I don't lose sight of that, from your perspective, that is an academic point because you said you did disclose it?

**MS. SMITH:**  That's right.  But even if the Court were to accept Plaintiff's allegation that the references were not included, the idea that Zogenix and the Defendants had scienter, had awareness, that excluding those references created a significant risk, and yet didn't include them in the package, it doesn't -- there is a disconnect.  It doesn't make sense.  I mean, again, this is an important thing for a life sciences company.  It is not expensive to make the references. So logically those --

**THE COURT:** Well, if you had withheld the material, then it becomes a question, I think, of the degree of risk. I mean, if internally the company for whatever reason decides that they want to take a significant risk and they don't disclose that it is a significant risk, then perhaps there is a claim there; but if it's just, We acknowledge that there -- our decision not to add this may impact it, but we don't think -- we still think we are going to get approval, then it doesn't sound like it is much of a scienter showing.

So isn't it a matter of the degree of risk we are talking about here? There has got to be a point -- if, again going back to this example which I'm not suggesting is there, but internally there is a meeting in the high level of management and they say, You know, because of competitive reasons and the other reasons we are just -- we need to barrel ahead on this NDA. And we recognize that we are -- we have only like a 25 percent chance of getting it approved but because of the particular nature of things, we are going to do it. And you don't disclose that to the marketplace, that could be a claim theoretically.

**MS. SMITH:** Theoretically, yes, Your Honor, yes, those are very general facts.

**THE COURT:** I understand.

**MS. SMITH:** Theoretically, that's right. The disconnect here is that there is just no reason to take any

risk because the thing that you are taking a risk on is so easy and simple. It's just references to existing literature. There is no reason why you wouldn't put that in. Any amount of risk --

THE COURT: So my understanding --

MS. SMITH: If you would appreciate any amount of risk, why wouldn't the company just make those references?

THE COURT: So what you are effectively telling me is to the extent there is risk here, it is that the company didn't do the new studies; and then the FDA came back and said, We want the new study. We want you to go back and do these studies. And so theoretically the company might have decided we are going to do those studies first and then do our NDA. And you decided that that's not how you were going to proceed. That was the risk from your perspective?

MS. SMITH: That's right. And the company disclosed that they weren't going to do -- all along, We are not going to do these studies. We are going to submit under 505(b)(2). FDA comes out of the blue and says, Nope. We changed our mind. We want the new studies. That is not this case.

THE COURT: I understand. I understand.

MS. SMITH: Of course.

THE COURT: Yeah.

MS. SMITH: So just a couple of quick additional points on scienter that we haven't talked about. Obviously,

Your Honor, recognizes there is no financial motives here, no insider sales, no stock offering; but a couple of other facts that are, I think, compelling with respect to the scienter inference, first is -- as Plaintiff admits in their Complaint -- Zogenix actually delayed filing its NDA once already.

So it had previously intended to submit its NDA at the end of 2018; received some feedback from the FDA that something else was required and so delayed its NDA and told the market it would delay and then filed when it was ready in February.

So the idea that Zogenix would be careful at the end of 2018; take additional time; tell the market there was going to be some delay and then recklessly exclude references to existing literature that are very easy and simple to make, it just doesn't hang together.

Another fact that is relevant, of course, is the timeline here.  So the way this works, you submit your NDA.  The FDA has 60 days to tell you whether it is going to accept your NDA or reject it, small window of time.  The idea that executives would be reckless and try to hide something from the market in 60 days when during that 60-day window, again, nothing is happening -- no stock offerings, no stock sales -- doesn't make sense.

Finally, one additional fact that bears noting is Zogenix submitted its NDA to the FDA.  It also submitted the equivalent

Application to the European Medicines Agency at the same time. The European Medicines Agency accepted the NDA based on the information that was included -- which the inference I think should be drawn from that is that the references were in both of those applications -- but setting that aside, the incentives were -- Zogenix had every incentive to get those applications accepted.  It received a milestone payment for having the European Medicines Agency accept its Application.  That's the financial incentive.  Get your NDA right and get it accepted and then you get a milestone payment.

I will give you the cite for that.

**THE COURT:**  Oh, isn't that beyond the pleadings?

**MS. SMITH:**  Well, it is in the 10-K.  It is in the 10-K.

**THE COURT:**  Well, then that gets into the question of what -- and this is that interesting issue that Judge Tashima spent a lot of time on in his *Khoja* decision about the distinctions between corporation by reference and judicial notice and the like.  You can certainly take notice of a 10K but not notice that everything in the 10K is then subject to judicial notice.  You take judicial notice of that document for very specific reasons, things like they filed the 10K on such-and-such a date and all that.

You are suggesting that you could take notice of some of the statements within the 10K, and I don't think you can take

judicial notice of that.

**MS. SMITH:** Of the truth of the statements in the 10K.

**THE COURT:** Correct.

**MS. SMITH:** I understand the distinction that you are --

**THE COURT:** So the statement is, Well, we got a milestone payment from the European agency -- you know, because of the approval of the European agency. That's getting out there, I think.

**MS. SMITH:** And I don't think -- I understand what, Your Honor, is saying. And I don't think you need to go that far in this case. The scienter is just completely lacking in all of the compelling -- the most compelling inferences all weigh in favor of the Defendants. And whether Mr. Apton is right about whether he wins a tie or not, I think even if -- this isn't a tie.

**THE COURT:** What is your view on that?

**MS. SMITH:** Oh, he doesn't. It is his burden. The PSLRA requires pleading with particularity, scienter and --

**THE COURT:** So if the inference -- if the -- he says the tie goes to the Plaintiffs. If the inference is just as plausible -- if it is equal plausibility, two people -- two sides have come forward with inferences that both of which are perfectly logical, then the tie does go to the Plaintiffs.

**MS. SMITH:** That is his view but --

**THE COURT:**  I know that.  What is your view?

**MS. SMITH:**  I don't think the Court needs to answer that question because this is not a tie.

**THE COURT:**  All right.

**MS. SMITH:**  And then, finally, on the falsity point if I might go back to that quickly.  Again, assuming for the sake of argument that the Plaintiff is right -- that Zogenix did not include references to the existing literature -- if the Court goes back and looks at the statements that are at issue, these statements are so general.

This is not a situation -- first of all, the statements are clearly true; and there are no allegations establishing that they are not true.  You know, their theory is that they are false -- misleading by omission.

These statements are not false or misleading by omission.  Not one of them says anything about the non-clinical package that goes in.  There are references to 505(b)(2).  Those are at a very general level.  This is how we submitted our package.  It says nothing about what was submitted.  No representations that Zogenix submitted specific references to the six and nine-month studies.

This isn't *Matrix*, right.  So in *Matrix* the situation was the executives had said, There are no safety problems with, you know, Zicam.  This doesn't cause anosmia.  We don't have any evidence of that.  And yet, allegedly they were in possession

of evidence that that was true; that there were studies showing that Zicam caused anosmia, right.

In that situation the company had spoken directly on the subject; was allegedly in possession of information that contradicted what it had said.  And, therefore, the statements -- even if maybe literally true -- were misleading by omission.  This is not that case.  The statements are, We submitted an NDA.  The FDA might not accept our NDA.  They are so general.

And if -- if I might just make one last point, I think Mr. Apton said that Zogenix chose to speak by saying that it had submitted an NDA.  Every single biotech company in the universe has to disclose when its NDA is submitted.  That is a very material event.  There is no situation in which a biotech could be silent about that, right.  It is -- it must be disclosed under the federal security laws that you filed your NDA.  It is -- it is just a material event.

So the idea that any time any public biotech company says, We submitted our NDA, that they then have to disclose all the very specific ways that could go wrong, that makes no sense. That would be a very different world than the one we currently live in under the federal securities laws.

THE COURT:  Mr. Apton, the -- if the state of facts at the end of the day is that there was disclosure of these historical studies but that Zogenix made the decision not to do

these new studies, which the FDA ultimately determined they had to do, that's not your case, right?

**MR. APTON:**  Your Honor, what you just said was factually incorrect.  The FDA is not making Zogenix do these studies.

**THE COURT:**  No, but the FDA is not approving the new drug application because there is no -- they don't have sufficient studies to submit to them.

**MR. APTON:**  So, Your Honor, what happened was -- and this is alleged in paragraphs 42 and 43 -- Zogenix resubmitted the NDA --

**THE COURT:**  Right.

**MR. APTON:**  -- with the references to the historical toxicity literature.  This is part of the reason why I'm so convinced and certain -- and why I alleged in paragraph 37 -- that they did not submit the references to these ICH studies.

**THE COURT:**  But, I mean, this is going to have to be ironed out.  That wasn't my question.

**MR. APTON:**  Sorry, Your Honor.

**THE COURT:**  My question was assuming -- I understand you are very -- continue to be very skeptical of their representation that they had submitted it.  And that, again, I really encourage the parties to at least get an understanding of what the true facts are before we go much further.

Assuming that they did -- even though you didn't think

they did.  Let's assume for purposes of my question that they did -- and the only issue then on which the NDA is initially denied by the FDA is the FDA's conclusion that new studies need to be done, you wouldn't have a case if that's the lay of the land.

MR. APTON:  Right.  Your Honor, and that would mean that the FDA changed its mind which Defendants don't -- they specifically disclaim in the reply brief.  They are not blaming the FDA.  The FDA did not change its mind.  The FDA always said, You do not need to do these studies.  You need to reference them because it is a 505(b)(2) Application.  You don't need to do them before the NDA was submitted and even after and even during the resubmission of the NDA.

THE COURT:  So your position is from the denial of the NDA, that -- there is no other possible explanation beyond they didn't submit the historical information.

MR. APTON:  The facts alleged right here right now say that this NDA was denied; refused to file because Zogenix failed to reference integral, non-clinical toxicity studies; specifically the six and nine-month ICH studies.

THE COURT:  You, of course, haven't seen it.  So you are pleading this --

MR. APTON:  No, Your Honor, I'm basing this off of Defendant Farr's statements and statements he made to --

THE COURT:  Well, they are saying you misinterpreted

those statements.

**MR. APTON:** I understand they are saying that, but I disagree with them very strongly. And I'm also relying on Defendant Farr's statements behind close doors to these analysts. Defendant Farr was talking to a number of people, not just on the public conference calls but with analysts too -- Piper Jaffray, Northland Capital -- and these analysts then turned around and reported exactly what I'm alleging.

**THE COURT:** Okay. So let me go back to Ms. Smith. Going to the analyst point, is it your view that the analysts -- well, number one, you can take issue with Counsel's characterization of what the analysts said -- but if the analysts are concluding that much to their concern and dismay you didn't submit this historical study information, they are just misinterpreting what Mr. Farr said, which is it?

**MS. SMITH:** The analysts are not misinterpreting what Dr. Farr said. And the reason we know that is because what the analysts are concerned about in their reports and in the calls is the timing. So what they are asking -- when they hear this new news that the FDA is going to require new studies to be conducted -- is how long are those studies going to take and when can you resubmit.

So there is no confusion on the part of the analysts what the FDA feedback was because they want to know, Hey, are you going to be able to go back to the FDA and persuade them --

remind them to look at the studies that exist already and will they accept the NDA or are we going to have to wait a year.

**THE COURT:**  But I will go back and look at the averments again.  Mr. Apton is suggesting that there is some indication that the analysts are expressing shock and dismay that the company did not provide information -- historical study information.  Is he wrong about that?

**MS. SMITH:**  I would urge the Court to review the analyst reports.  I think he is just wrong about that.  I do not think the analyst reports say that.

**THE COURT:**  It is funny because I have had many securities case.  And almost without exception we are talking about the same things we are talking about today, scienter and falsity, of course.  But rarely is there such a disconnect about -- both sides are sort of guessing about what the other side did.  And one side is saying those facts are just not true.

These are very basic sort of facts.  They are not nuanced questions.  So it is a curious -- now maybe this happens in the pharmaceutical securities cases which, you know, we don't have as many of those here as they do in New Jersey and Delaware and those venues; but it is a curious situation to me but --

**MS. SMITH:**  I agree, Your Honor.  If I may, though, let me give you one example.  This is the Northland Capital analyst report.  It is Exhibit 12.

**THE COURT:**  Okay.

**MS. SMITH:**  This is what the analyst says:  Issue Number One, non-clinical toxicology data:  In prior and verbal written interactions with the FDA the company was not directed to provide non-clinical toxicology as the NDA for Fintepla was being filed using the 505(b)(2) pathway that would allow inclusion of toxicology data from NDA of fenfluramine; i.e. Pondimin, filed in 1972.

I don't read that as the analysts reaching the conclusion that the company didn't submit the studies and that the analyst is now puzzled and flabbergasted about why those studies were not submitted.

All this analyst is actually saying is the FDA told Zogenix it didn't have to do the studies.  It didn't have to provide the non-clinical toxicology in the first instance because it is submitting under the 505(b)(2) pathway.  But now the FDA is telling the company it has to do the studies.

I mean, that's what the analysts are surprised about.  And Zogenix was every bit surprised as well.  That is the market surprise.  There is no statement in here that the analyst is surprised and dismayed to learn that the references were not submitted.  I think it is fairly clear.

**THE COURT:**  I can consider that on the incorporation idea because the study is referenced in the Complaint or the analyst --

**MS. SMITH:**  The analyst reports are referenced in the complaint.  That's correct, Your Honor.

**THE COURT:**  Mr. Apton, go ahead.

**MR. APTON:**  With respect to that same -- what is it -- one sentence or two sentences -- the reason the analyst is saying that is because it makes no sense that the company didn't include these references.  The plan all along was to include the references to these studies.  Yet, it did not do that.  So this analyst is saying --

**THE COURT:**  But they are saying they did do that.

**MR. APTON:**  Where -- that's not in the Complaint, Your Honor.  We have been -- we are arguing --

**THE COURT:**  In the Complaint.

**MR. APTON:**  -- about facts.

**THE COURT:**  I mean, I'm just saying right here in court they are indicating to me -- they are saying that they did disclose that.

**MR. APTON:**  Your Honor, I don't see how I'm ever supposed to defeat a Motion To Dismiss if I put together all these facts that are cogent, compelling and make strong inferences if Defendants can come in and basically do what the Court said was not allowed in *Khoja v Orexigen*.  It is just not fair, not at this juncture of the proceedings.

For example, if Defendant Farr honestly believed --

**THE COURT:**  But at the same time, if at the end of the

day, they did disclose, then this case -- you need to know that.  You don't want to waste your time on a case that at the end, you know, you may -- I'm not disagreeing with the -- with your notion that you are a bit hamstrung in this process.  But your case can't get revived -- if, in fact, the facts are as they suggest they are, and they simply weren't forthcoming with you about that, that doesn't mean your case could go forward. It just means they -- we wasted a lot of time.

**MR. APTON:**  I agree, Your Honor.  And, perhaps, right now I will seek Your Honor's leave to file a motion for limited discovery in spite of the PSLRA's discovery stay.  And it could be just for the RTF letter and some sort of confirmation.

**THE COURT:**  I sort of was getting the indication -- and maybe this is wishful thinking -- that the Defense side was -- had some recognition that there might be a mechanism by which they could give you the information that would demonstrate from their perspective that they had disclosed this information in the NDA.

Maybe I'm just -- maybe it is wishful thinking, but it seems to me that rather than the formal discovery process -- I'm not saying I wouldn't -- I'm not foreclosing that, by the way -- but that will then get into a whole discovery dispute about whether -- you know, whether or not discovery is appropriate and the scope and all the rest; where on a much more informal basis, if there is requisite good-faith on both

sides, it would seem to me it would behoove the Defendants to show some of this to the Plaintiffs, but --

**MS. SMITH:** I understand Your Honor's comments and certainly will discuss them with my client.

**THE COURT:** Okay.

**MS. SMITH:** One thing should be clear, we would obviously oppose any limited discovery request and the PSLRA doesn't allow Plaintiff --

**THE COURT:** It doesn't foreclose it.

**MS. SMITH:** It does not foreclose it, but --

**THE COURT:** So you shouldn't operate on the assumption that that is a non-starter from the get-go because there are certainly cases where certain limited discovery, even at the pleading stage, the Court does have the -- I think the leeway to do that in the appropriate case.

**MS. SMITH:** In exceptional circumstances I think, Your Honor; but also in this situation, it's a moot point because the rest of the Complaint fails.  Even if you assume that they are right -- that the references were not included in the initial submission -- they can't clear the scienter bar.

**THE COURT:** Well, yes, but the way that would play itself out, I presume, is to the extent that I interpret what you just said as saying:  You, Judge, should not only grant our Motion To Dismiss but you should do it with prejudice in the first go-around, that doesn't happen.  They will get leave to

amend.

So then the question is -- the order comes down granting your motion with leave to amend.  And then that's when presumably if you can't work out some informal way to do this, I will, perhaps, hear from the Defendants to say, Well, we want to do some limited discovery before we file our Amended Complaint.  That's when this battle will be joined, and I'm not going to prejudge that question.  I actually -- if we got to that point, I would ask for probably some briefing on that.

**MS. SMITH:**  Understood, Your Honor.  At least on this Complaint, obviously our position is that this Motion To Dismiss should be granted.  And then I, with my client, can discuss whether there is some other mechanism.

**THE COURT:**  Okay.

**MR. APTON:**  Your Honor, at this stage of the proceeding I just don't understand why I'm not entitled to have my allegation in paragraph 37 be accepted as true given all of the information, the statements that Defendant Farr has made upon which paragraph 37 is based.

**THE COURT:**  Well, I won't rehash everything.  I understand the arguments, and I will go back and take a look and give you an order.  So anything further, either side?

**MS. SMITH:**  Not from me, Your Honor.

**THE COURT:**  Okay.

**MR. APTON:**  Thank you, Your Honor.

**THE COURT:**  Thank you very much.  I will go back and as I say, you are my -- do my homework and issue an order.

(Proceedings adjourned at 3:20 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, February 10, 2020

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter